PEOPLE EX REL. CONNOR, PETITIONER, v. STAPLETON ET AL., RESPONDENTS.

1. LIBERTY OF THE PRESS.

The liberty of the press is a great blessing and is entitled to full protection; but the "abuse of that liberty" is a great evil against which the people are entitled to be protected; and, for their better protection against such evil, resort may sometimes be had to summary proceedings.

2. OBJECTS OF THE JUDICIARY.

Judicial tribunals are established, not for the benefit of those occupying judicial positions, but for the benefit of society and the protection of litigants.

3. IMPARTIALITY OF THE JUDICIARY.

Courts of justice should be no respecters of persons; the law must be declared impartially without fear or favor.

4. SLIGHT MITIGATION.

Where an unlawful publication is shown to have been made without the previous knowledge of the publisher, such fact may be shown in mitigation, though not in justification, of the publication, and the mitigation is slight, unless accompanied by a retraction.

5. RATIFICATION.

When the act of an employee is either directed or afterwards ratified by his employer, it becomes the act of the employer, and the maxim, *Respondeat superior*, applies.

6. PROVINCE OF COURT.

It is not the province of the supreme court to prosecute or defend causes pending for review.

7. FAIR INTERPRETATION AND CONSTRUCTION.

Contempts necessarily include all acts calculated to impede, embarrass or obstruct the court in the administration of justice.

In a contempt proceeding for the publication of a newspaper article, the publisher is entitled to have the article fairly interpreted and construed.

8. POWER OF THE COURTS.

The jurisdiction to punish for contempt is inherent in superior courts of record; such power existed at common law, and is not essentially abridged by the constitution of this state.

9. POWER LIMITED.

The power of the courts in contempt proceedings is not unlimited. No department of the government possesses unlimited power under a constitution like ours.

**10. PUNISHMENT LIMITED.**

In the absence of valid written law specifying what shall, and what shall not, be deemed contempt, the common law must govern. By the common law, punishment for contempt extends only to fine and imprisonment, and such punishment can be inflicted only within reasonable limits proportionate to the offense.

**11. CONSTRUCTION OF LANGUAGE.**

A writing consisting of common words should be interpreted and construed according to the ordinary meaning of the words employed. In a case of contempt, if there be any doubt as to the meaning of the published article, the publisher should be given the benefit of the doubt.

**12. FORMS OF DEFAMATION.**

It is impossible that the law shall specify the particular words or particular methods of defamation which shall be unlawful, since other words and other methods equally defamatory may be resorted to.

*Original Proceeding in this Court for Contempt.*

THE facts necessary to an understanding of the opinion are as follows : A little more than three years ago, James Connor, Charles Connor and James W. Marshall, having been convicted in the district court of Arapahoe county for conspiracy and sentenced to a term of imprisonment in the county jail, brought the record of such conviction to this court for review.

Upon examination of the record it appearing probable that error prejudicial to the legal and substantial rights of the accused had been committed on the trial, a supersedeas was granted, and the cause was regularly docketed. The record was very voluminous. It was four months before the abstract and briefs were filed in behalf of the accused.

No brief in behalf of the people was filed until more than a year and a half after the cause was docketed.

Neither party ever filed any petition or made any motion asking to have the cause advanced.

The cause was regularly reached for final hearing, and was placed upon the calendar for oral argument with other causes in March last. Counsel for the accused then appeared and argued the cause. No one appeared in behalf of the people. The legislature was then in session, and frequently

requested opinions from this court. Many important causes were then under advisement, so the cause could not be immediately taken up and disposed of.

Not long after the oral argument the municipal election occurred in the city of Denver, April 4, 1893.

While the Connor case was still under consideration by the court, Charles Connor, by a sworn petition presented to this court by his counsel Mr. Carpenter, set forth, among other things, the following:

That on April 14 and 15, 1893, *The Denver Republican* was a newspaper published in Denver and having a general circulation throughout the state, and that the respondents William Stapleton and Kemp G. Cooper were respectively the editor and manager of said paper.

That on April 14, 1893, there was published a lengthy article in the local columns of said newspaper in which it was asserted, among other things, that one of the recently elected aldermen had been bribed to betray his party, and that James Connor and Charles Connor, "notorious political thugs who walk the streets of Denver as living examples of the law's delay, engineered the plot." It was further stated that from $1,000 to $5,000 had been made use of for such corrupt purpose. The article also contained the following:

"It is a disgrace to the courts that the Connors should be allowed to remain at large to prey upon the political cancers and failings of humanity. Jim Connor is under conviction for train robbery, and he is also under sentence of penal servitude for having stolen a ballot box. His brother, Charles Connor, participated in the train robbery.

"THEIR TRAIN ROBBERY RECORD.

"The first crime was committed four years ago. Jim Connor was then a lieutenant of police and his brother was also in the service. With Jim Marshall of Kansas, a bird of the same feather, and a messenger, they conspired to rob the Denver and Rio Grande Express. A package, the most valuable in the train, was to be thrown out at an appointed spot, and Connor was to be in readiness to receive it. Some of

the conspirators wilted at the last moment and the express company was informed. The plot was foiled, but the evidence against the principals was overwhelming, and they were convicted.

" The Connors appealed to the supreme court nearly three years ago, but the court has taken no action, and the culprits are abroad buying aldermen and helping Tammany to retain control of the city government. It is humiliating to the whole state that a man like Jim Connor could have influence enough to prevent the highest tribunal from handing down a decision in his case. There must be influence of some kind at work somewhere."

In the same issue of said newspaper there was published a lengthy editorial, charging the Connors with inducing said alderman elect by *despicable and dishonest* means to vote against his party in the organization of the aldermanic board. This editorial also contained the following:

" In this connection it is pertinent to call the attention of the supreme court of the state to the fact that for more than three years the appeal taken by Jim Connor and Charley Connor from the decision of the court which sentenced them to prison for attempted train robbery has remained undecided on the calendar of that tribunal. It would be interesting to know what mysterious but evidently powerful influence has retarded the machinery of justice so strikingly in this case. It would also be interesting to know how soon the supreme court can make up its mind to render a decision upon that appeal."

On the next day, April 15th, there was published another lengthy local article denouncing the Connors with the corruption of the alderman elect, and again stating the money used to be from the sum of $1,000 to $5,000. This article, among other things, contained the following:

" IT SEEMS SO.

" Some people claim that there is no use in indicting or convicting men like Jim Connor, as they are never punished. The history of Connors' crimes would lend some sem-

blance of truth to this argument, but people of Denver have had enough of Connors and others of his kind.

"The citizens will not tolerate longer the methods of screening blackguards who may have some political influence because of their past crimes against the ballot. The city of Denver is not big enough for Jim Connor and Charlie Connor and other jail birds who are a menace to society every day they are allowed to be at large. The time has arrived when these corruptionists and political thugs who have been found guilty of various crimes shall receive their deserts. It is an opportune moment to clear the atmosphere. The present grand jury can do a great deal in that respect.

"Every day the supreme court allows to pass without its taking action on the appeal of the Connor brothers is an encouragement to commit crime. The city should have been rid of these men long ago. There can be no earthly excuse for the supreme court in any manner shielding them from the punishment they so richly deserve."

The petition of relator further alleged in effect that the articles so published were false, defamatory and malicious, and were designed to prejudice his cause so pending before this court; that said publications were calculated to convey the idea that the judges of this court had been improperly and corruptly influenced in his cause; and that such charges against the honesty and integrity of the court were meant to intimidate, influence, and coerce the judges, and to embarrass them in the administration of justice. Petitioner prayed that respondents might be proceeded against for contempt.

Upon the presentation of said petition, this court entered a rule against respondents requiring them and each of them to "appear and answer in writing showing cause, if any they have, why they have published or caused to be published so much of said newspaper articles as charge this court with dishonesty or want of integrity or with being improperly influenced in and about said cause of *James Connor et al. v. The People,*" etc.

The rule was "expressly limited to so much of said news-

paper articles as contain charges and imputations against the honesty and integrity of the members of this court in and about said Connor case."

The rule was based upon the ground "that said charges are designed and intended to interfere with, intimidate and embarrass this court in the due and impartial administration of justice, and that said charges, if allowed to pass unnoticed, may injure the standing and usefulness of this court by impairing public confidence in the honesty and integrity of its members."

The answer of respondents is sufficiently set forth in the opinion. The sufficiency of the answer was challenged by demurrer filed by the attorney general in behalf of the people.

Mr. EUGENE ENGLEY, attorney general, and Mr. S. L. CARPENTER, for petitioner.

Mr. L. B. FRANCE, for respondents.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

1. This is the first proceeding of the kind originating in this court. A few cases have been brought here for review involving contempts against other courts of record; and in such cases, the law has been carefully considered and conservatively declared. In thus declaring the law this court has always kept in view the rights of the people, as well as the maintenance of lawful judicial authority for the protection of litigants and the welfare of society. No attempt has been made to abridge the freedom of speech, nor the liberty of the press, though in some instances persons have been held *responsible* for the "abuse of that liberty," as our constitution provides they may be. The liberty of the press is a great blessing; it is entitled to full protection; but the "abuse of that liberty" is a great evil against which the people are entitled to be protected; and for their better protection, when necessary in the interest of litigants, resort

may be had to summary proceedings.   Constitution of Colorado, art. 2, § 10 ; *Hughes v. The People*, 5 Colo. 436 ; *Cooper et al. v. The People*, 13 Colo. 356–373, and cases there cited.

2. This court has never lost sight of that cardinal principle of free government, that judicial tribunals are created and maintained, not for the benefit of those occupying judicial positions, but for the benefit of society and the protection of the people in the enjoyment of their rights.   To this end, it is essential to uphold the courts in the lawful exercise of their authority and jurisdiction.   The law-abiding people of the state are primarily interested in the due administration of justice, since it is only by such means that they can be made secure in their persons and property.

It is a matter of congratulation, that proceedings of this kind have been of rare occurrence in this state ; it shows that the publishers of newspapers, for the most part, have been loyal to the courts as tribunals of justice, and have sought to uphold, rather than to impair, their usefulness.

3. This proceeding was not instituted or instigated by this court of its own motion.   A party whose cause was pending in this court presented his sworn petition complaining of the articles published by respondents, and praying protection from such assaults pending the consideration and determination of his cause.   We were thus bound to take cognizance of his petition or give some reason for refusing so to do.   If we refused, what reason could we give ?   Could we say to petitioner :  " You are a convicted criminal, and, therefore, you have no rights which this court is bound to respect ? "

The true spirit of our institutions and the fixed policy of our government require that courts of justice shall be no respecters of persons.   The courts are bound to hear and determine causes according to settled rules of law, without regard to the bias or prejudice of interested parties, or the force of popular clamor.   The law must be declared fairly and impartially, no matter who may be parties to the record. In this way, and in this way alone, can courts of justice fulfill their mission as conservators and protectors of public and

private rights under a free government which guarantees to all persons "the equal protection of the laws." These principles are as applicable to appellate tribunals as to courts of original jurisdiction. Parties must be allowed to appeal their causes to this court with the assurance that they will be heard and determined as they appear upon the record, and that, without fear or favor from any one, either of high or low degree. We cannot assent to the demand that the settled rules of law relating to substantial rights shall be disregarded in order to convict unpopular persons, or persons of mean reputation. Such persons, as well as the more fortunate classes, are entitled to have the law fairly and impartially adhered to when they are put upon trial.

It is true, this court could have disposed of the petition in this case, by quietly declining to take cognizance of it. Only petitioner, his counsel, and a few of their confidential friends, perhaps, would have known of our refusal. But we should always have been conscious that we had been wanting in courage to meet a disagreeable issue ; and that we had declined to hear a suitor because he was under the ban of a public newspaper's displeasure. The only just and honorable way, therefore, was to take jurisdiction of the proceedings, and require respondents to show cause, if any they had, why they had thus deliberately and repeatedly assailed the honesty and integrity of this court in and about petitioner's cause.

4. By joining in their answer, respondents place themselves upon the same level in respect to the publications. Their counsel in his argument suggests that respondent Cooper was not aware of any of the articles until after they were published. No such fact, however, is pleaded ; and the well-known skill and customary diligence of the learned counsel in matters of pleading forbid that we should regard this as an oversight. If it had been requested, leave would have been given for said respondent to amend his answer.

Where an unlawful publication is shown to have been made without the previous knowledge of the proprietor of a news-

paper, such fact may be shown in mitigation, though not in justification, of the publication; and the mitigation is slight, unless accompanied by a retraction. In this case, however, respondents do not deny previous knowledge as to the editorial article, nor do they express regret for any of the articles. On the contrary, they seek to defend them all upon various grounds.

5. The answer of respondents alleges that the first local article " was published without the direction, instigation, or knowledge of said respondents, and that they, nor either of them, were cognizant of said article until after the publication of the same." As to the local article published the next day, a similar allegation is made.

These allegations may be literally true; that is, the local articles may not have been expressly directed or instigated by either respondent Stapleton or respondent Cooper; and the articles may not have been seen or communicated directly to either of respondents until after they appeared in print. Nevertheless, considering the subject-matter of the first local article and the subject-matter of the editorial published on the same day, it is impossible to believe that the editor and reporter did not have a perfect understanding as to the position which the paper should take in reference to this court, as well as the other matters discussed by them in their respective articles. The views of the editor supplement and indorse the language of the reporter; and the very next day the columns of the paper are again made use of by the reporter to repeat the attack thus made upon this court. When the act of an employee is either directed or afterwards ratified by his employer, it becomes the act of the employer, and the maxim, *Respondeat superior*, applies.

6. Respondents further allege that the " reference to said cause and to this honorable court was for the purpose rather of calling attention to the dilatory conduct of those having charge and management of said cause in said court, and not for the purpose of casting any reflection whatever in the premises upon the court itself, or upon any judge thereof."

The sufficiency of this defense cannot be accepted.  Let any intelligent person read the articles, and then say, if he can, that they were written for no other purpose than " calling attention to the dilatory conduct of those having charge and management of the Connor case.  By a simple inquiry at the clerk's office respondents would have learned that the Connor case was brought here and docketed the same as hundreds and thousands of other cases; that the cause had been given its regular place upon the docket; that neither party had ever asked to have the cause advanced for final hearing ; that the cause had already been argued orally in open court ; and that the judges then had the cause, as well as many other causes, under consideration.

Every lawyer and every intelligent citizen understands that it is not the province of this court either to prosecute or defend causes brought here for review.  It would be quite out of place for this court of its own motion to advance or dispose of any cause out of its order.  It is the well-known practice of this court to advance a criminal cause and hear and determine the same as speedily as practicable when asked to do so by either party.  But if a cause were advanced without any such request, such action might well be taken to indicate undue zeal, or some ulterior motive, on the part of the court.

The supreme court is not charged by law with the management or prosecution of criminal causes ; and we are confident that respondents well understood this much of the law and practice.  Why, then, did they not arraign those whose duty it was to prosecute the Connor case, instead of directing their attack solely against this court?  Not one word is said against those whose duty it was to prosecute causes in this court.  The claim that respondents only intended " calling attention to the dilatory conduct of those having charge and management of said cause " is evidently an after-thought —an excuse without foundation, put forth at this time to enable them to escape the consequences of their conduct.

7. Again, respondents allege that a fair construction of

the articles published by them "will not warrant the inference or implication against the good faith or integrity of this honorable court, or that they were, or had been, improperly influenced in and about the cause of the said relator" (the Connor cause); and that the articles were published "not for the purpose of casting any reflection whatever in the premises upon the court itself, or upon any judge thereof."

Respondents are certainly entitled to have the articles published by them fairly interpreted; the articles require very little construction. It is safe to say that every intelligent and impartial person who may have read said articles, at once inferred that such articles were designed to convey the impression that this court had in some way been improperly and dishonorably influenced in the matter of the Connor litigation. Bear in mind that the first local article charged the Connors with handling money by thousands of dollars for corrupt purposes in the organization of the municipal government. In view of this, what other meaning or construction could be put upon such language as the following in the first local article : "It is humiliating to the whole state that a man like Jim Connor could have influence enough to prevent the highest tribunal from handing down a decision in his case. There must be influence of some kind at work somewhere?"

What other interpretation or construction could be put upon the second local article, wherein it is said: "There can be no earthly excuse for the supreme court in any manner shielding them (referring to the Connors) from the punishment they so richly deserve?"

How can it be claimed that respondents did not intend by said article to impute anything dishonorable to this court, when in their paper they charge that a convicted criminal whom they have stigmatized as the worst of characters—a boodler, and a corruptionist—*has influence enough to prevent this court from handing down a decision in a case wherein he had been convicted of crime?* The next article charges that this court is *shielding convicted criminals* from the punish-

ment they so richly deserve; and yet respondents say, that such charges imply nothing dishonorable on the part of this court! Can it be that respondents are insensible to the significance of such language?

The editorial article is scarcely more guarded; it is more crafty, but not less poisonous and suggestive. The editorial is a severe arraignment of a certain political organization and certain individuals, including the Connors, charging them with dishonesty, fraud and corruption in and about their efforts to defeat the will of the people and obtain control of the municipal government of the city of Denver. With the editorial as a discussion of municipal politics, this court, as a court, has no concern. But let any intelligent and impartial person read the editorial from beginning to end, and then explain, if he can, why it was *pertinent in connection with the other matters discussed in that editorial* to call the attention of the supreme court to the Connor case, and thereupon to remark: "It would be interesting to know what mysterious but evidently powerful influence has retarded the machinery of justice so strikingly in this case?" Why was such language used, unless it was intended thereby to indicate that the supreme court was in league or in sympathy with the Connors, and was so acting as to shield them while they and their associates were corrupting and seeking to subvert and destroy good government in this city?

Every right-minded judge may well be sensitive to any charge made, by a responsible party, affecting his judicial integrity. In any light in which the articles published by respondents can be viewed, the attack upon this court was as cruel and malignant as if the judges had been severally stabbed with a dagger, without provocation and without warning. If the attack did not wound so deeply, it was not because of the means employed, but because the people did not believe the aspersions cast upon the integrity of their judges.

Since the issuance of the citation in this proceeding, the case of *James Connor et al. v. The People*, has been decided. Referring to this circumstance, it was intimated in argument

that this court cannot properly say, and cannot afford to say, that it was intimidated, coerced, or influenced in its decision of that cause by the conduct of respondents; that respondents, therefore, committed no contempt and should be discharged. As well might a person, after making a violent assault upon another, insist that he had committed no offense, because he had not succeeded in overcoming his victim.

It is true, the members of this court did not suffer themselves to be intimidated, nor coerced, nor are we conscious of having been influenced in the determination of the Connor case by anything respondents have published. Nevertheless, the conduct of respondents in making charges and imputations against the integrity of this court in and about the Connor case was well calculated to embarrass, was undoubtedly intended to embarrass, and to some extent did embarrass the court in rendering its decision in that case; and thus a most serious offense against the administration of justice was committed. Contempts, as was said by Mr. Justice Breese, in 3 Scammon, 405, necessarily include "all acts *calculated* to impede, embarrass or obstruct the court in the administration of justice." This language was approved and applied thirty years afterwards in the case of *The People v. Wilson*, 64 Ills. 211. As was said by Mr. Justice McAllister in the latter case: " The tendency of the article is to degrade and scandalize the court, to overawe its deliberations and extort a decision against the accused."

Judges are human; they are possessed of human feelings; and when accusations are publicly made, as by a newspaper article, charging them directly or indirectly with dishonorable conduct in a cause pending before them and about to be determined, it is idle to say that they need not be embarrassed in their consideration and determination of such cause; they will inevitably suffer more or less embarrassment in the discharge of their duties, according to the nature of the charges and the source from which such charges emanate.

When a judge tries and determines a cause in connection with which public charges against his judicial integrity have

been published, the public as well as parties interested are frequently led by the publication of the charges to distrust the honesty and impartiality of the decision; and thus confidence in the administration of justice is impaired. It is not only important that the trial of causes shall be impartial, and that the decisions of the courts shall be just; but it is important that causes shall be tried and judgments rendered without bias, prejudice, or improper influence of any kind. It is not merely a private wrong against the rights of litigants and against the judges—it is a public wrong—a crime against the state—to undertake by libel or slander to impair confidence in the administration of justice. That a party does not succeed in such undertaking lessens his offense only in degree.

8. The answer of respondents denies the jurisdiction of the court to proceed against them in this proceeding. It is unnecessary to enter into a lengthy discussion of the law relating to newspaper interference with the administration of justice. In the case of *Cooper et al. v. The People*, 13 Colo. 337, the law upon that subject was very fully considered and explicitly declared. The case of *Hughes v. The People*, 5 Colo. 436 is also a valuable decision upon a similar subject. In the argument of this case, nothing essentially new has been presented. In fact, upon the oral argument, the law as declared by the former decisions of this court was not seriously controverted, except upon a single point, which will be briefly noticed.

The learned counsel for plaintiffs in error in the case of *Cooper et al. v. The People*, appeared, also, for respondents in this case, and in argument claims that his position in the former case was misunderstood. He says that he did not mean to be understood as contending in the former case " that the publishers of newspapers have a constitutional right to assail the integrity and impugn the motives of a judge in relation to his judicial action, even in cases pending and undisposed of, without being amenable to contempt proceedings therefor; " and that he does not now contend

for such doctrine. He says he intended to concede then, as he concedes now, that the jurisdiction to punish for contempt is inherent in superior courts of record; and that such power is essential to their existence and to the maintenance of their authority; that such power existed at common law, and is not essentially abridged by the constitution of this state; but that while he concedes the existence of such power, he nevertheless insists that such power is subject to legislative control, and that such power has been limited to such causes of contempt as are specified in the Code of Civil Procedure.

We are glad to note this explicit statement of the learned counsel's position. Though he may have been misunderstood by the writer of the separate opinion in the former case, his views in respect to the effect of the code were not misunderstood nor overlooked. In the leading opinion delivered by Mr. Justice Hayt, and concurred in by the whole court, the effect of the code provisions was considered and passed upon. Reference was made to the opinion of *Hughes v. The People*, 5 Colo. 436—446, where it was held, as early as 1880, that " the right of self protection is inherent in the courts; the power to punish for contempt is an incident to all courts, *independent of statutory provisions.*" In the Hughes case, also, this court, speaking by Mr. Justice Stone, Chief Justice Elbert concurring, Mr. Justice Beck not sitting, said: " Such a statutory enumeration of causes as is found in our code, when applied to the ever varying facts and circumstances out of which questions of contempt arise, cannot be taken as the arbitrary measure and limit of the inherent power of a court for its own preservation, and for that proper dignity of authority which is essential to the effective administration of law."

The Hughes case was based upon the Code of 1877, which was repealed in 1887. Chapter 30 of the present Code is, however, a substantial re-enactment of the former provisions relating to contempt proceedings. These provisions were re-enacted more than six years after the announcement of the

decision in the Hughes case. Thus by a well known rule of statutory construction it must be presumed that the legislature had knowledge of, and were satisfied with, the construction given to such provisions, and so re-enacted them without change. *Harvey v. Travelers Ins. Co., ante,* 354. Moreover, neither in the Code of 1877 nor in the present Code are there any negative or other qualifying words limiting contempts to such causes as are therein specified.

9. Upon the oral argument the learned counsel for respondents inveighed strongly against what he termed the claim of unlimited power on the part of the courts in the matter of contempts. So far as we are advised, no court in this country has ever claimed any such power. This court certainly has not. It is idle to speak of the power of the courts as being unlimited in contempt proceedings, or in any other proceedings, for that matter. No department of the government possesses unlimited power, under a constitution like ours. This subject has recently received the consideration of this court. See *Greenwood Cemetery Co. v. Routt,* 17 Colo. 163, wherein it is said :

" Thus it appears that the different departments, though separate, distinct and independent to a certain extent, are by no means absolute. The distribution of governmental powers to different departments was obviously intended as a check upon the exercise of arbitrary power by any department; thus a government of balanced powers was established with checks and counter-checks for the better protection of society, and the better security of private rights and individual interests."

10. The courts of this country, so far as we are advised, have never claimed the arbitrary right to declare what should, or what should not, be deemed contempts; nor have they claimed unlimited power or discretion to affix the penalty in such cases. In the absence of valid written law specifying what shall, and what shall not be deemed contempt, the common law must govern.

The constitutional provision, art. 2, sec. 20, " that exces-

sive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," is binding upon all departments of the government, and is a special restriction upon the courts. By the common law the punishment for contempt extended only to fine and imprisonment, and certainly no court in this country has ever claimed that such punishment can be inflicted except within reasonable limits proportionate to the offense.

Speaking upon this subject, Mr. Justice Hayt in *Cooper et al. v. The People*, after quoting from Blackstone and Cooley, said :

" It must not for this reason be understood that we claim the power of the courts to punish as for contempts is now as indefinitely broad as stated by Blackstone. However, upon principle and authority we must hold, that at common law superior courts of record have the inherent power summarily to convict and punish as for a contempt of court those responsible for articles published in reference to a cause pending, when such articles are calculated to interfere with the due administration of justice."

Chief Justice Helm, in the same case, also said :

" We recognize in this case, as we have heretofore done, the inestimable value of a fearless and independent press ; but we would be grossly neglectful of our official duty were we, while carefully guarding the independence of the press, to forget that independence of the judiciary which is absolutely essential to constitutional government and liberty."

In *Wyatt v. The People*, 17 Colo. 261, it was said :

" Though the legislature cannot take away from courts created by the constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded as binding."

While the courts do not possess unlimited power to declare what shall be deemed contempts, and what shall be the measure of punishment therefor, neither do the publishers of newspapers possess unlimited license to publish whatsoever they please. The liberty of the press is one thing ; the " abuse of

that liberty " is quite another.   The former is guaranteed by
the constitution ; the latter is as clearly interdicted.   If the
liberty of the press is abused, the offender may be held re-
sponsible therefor.   Such is the common law ; such is our
constitutional provision ; and such offenders may be dealt
with summarily for contempt when their publications are
calculated to impede, obstruct or embarrass the administra-
tion of justice.

It has not been deemed expedient by our people that any
class of persons should be privileged to attack the courts
with the view to interfere with the rights of litigants or to
embarrass the administration of justice ; hence, they have
never adopted any constitutional provision granting such
dangerous license ; nor do we believe that publishers of news-
papers generally would approve of such license being granted ;
if they should, we are confident that the intelligent people
of Colorado cannot be deceived or led into a course of action
that would jeopardize their rights and interests as litigants,
and imperil the safety of our free institutions.   If courts of
justice may be publicly assailed by libel and slander or other-
wise threatened and traduced in respect to causes, civil or
criminal, pending before them for hearing or trial, then, in-
deed, no one's rights are any longer safe, and life, liberty and
property are held by a feeble tenure in this commonwealth.

Do the good people of the state of Colorado desire that
the judges whom they have chosen shall be threatened, ma-
ligned, intimidated, or dictated to, in respect to the trial or
decision of causes ?   Is it desired that courts of justice shall
sit in this state to register the behests of a public newspaper ?
Is it desirable that the law should be so framed that the
publisher of a newspaper may interfere with the orderly ad-
ministration of justice in the courts ?   If a publisher shall
thus undertake to interfere, is it desirable that the courts
shall be powerless to hold him responsible therefor in such
time and manner as that the mischief he seeks to accomplish
may be avoided or summarily punished ?   In short, is it de-
sirable that causes shall be tried and determined by the
courts, or by the publisher of some newspaper ?

With all due respect for the profession of journalism, and with no desire to restrict or interfere with its sphere of usefulness, we must declare that the courts possess advantages superior to the journalist in the matter of hearing, trying, and determining causes affecting public and private rights. The law as administered by the courts gives each party an opportunity to present his cause by pleading and proof, each party having had previous notice of what the other claims. The court decides only after each party has had opportunity to be heard.

The enterprising journalist acts promptly in gathering news; his information is frequently *ex parte;* and his comments and conclusions thereon are hurriedly announced. The demands of the public require this course of action at the hands of the journalist. But it is not demanded that he shall assume the duties of the judiciary. Imperfect as may be the conclusions of the court in some cases, it would be a great mistake to substitute in their place the local comments, or even the editorial opinions, of the press. The injuries to public and private rights occasioned by the present methods of administering justice are as nothing to what would result, if causes were determined without fair opportunity for hearing and trial; as was said by the wise man of old: " He that answereth a matter before he heareth it, it is folly and shame unto him."

Thoughtful citizens know very well that there is far more danger to our institutions, and far more danger to the rights of the people, and especially to the rights of litigants, to be apprehended from the power of the press over the courts, than from the power of the courts over the press. It would be a strange anomaly in a free government, where judges are elected for comparatively short terms, and where the right of suffrage is practically universal, if the judges elected by the people were to become arbitrary oppressors of the people, or of any class of the people. Thoughtful citizens understand that the danger now threatening our institutions is, that courts are not independent enough, instead of being too arbitrary; and that there is too great laxity instead of too

great severity in the administration of justice for public as well as for private good.

The courts of this state have not been oppressors of the people. The power of punishing for contempt has been seldom resorted to. Since Colorado became a member of the Federal Union, nearly seventeen years ago, only one case has reached this court where the publishers of a newspaper have been adjudged guilty of contempt for attempting to interfere with judicial proceedings. Other instances, perhaps, may have occurred where newspapers have gone beyond their legitimate limits, of which the courts, with their customary forbearance, have not thought proper to take notice. It is a matter of common observation that the courts of this country are reluctant to exercise the extraordinary power vested in them in regard to such matters.

11. As a conclusion to their answer, respondents insist that it was their duty as editor and manager of a newspaper to examine, criticise, comment upon or condemn publicly in said paper the proceedings and conduct of the persons mentioned in the said articles; and that said articles and all of them were published with just, legal and proper motives, and without any intention whatever to reflect upon this honorable court.

It would be a very pleasant way to dispose of this proceeding for us to accept these oft-repeated assurances that respondents did not intend or design by their publications to convey the impression that this court had been actuated by unworthy motives or controlled by dishonorable influences in the Connor case. But it would be an affectation of credulity on our part to profess to believe such assurances. It is the province of the court to interpret and construe written language. In a case of this kind, if there be any doubt as to the meaning of the defamatory article, the publisher, upon disavowing evil intent, is entitled to the benefit of the doubt. *In re Wooley*, 11 Bush (Ky.) 95; *People v. Freer*, 1 Caines (N. Y.) 485. But it is an elementary rule of construction that a writing consisting of common words shall be interpreted and construed according to the ordinary meaning of

the words employed. The articles complained of contain only common words, and it would be a perversion of their ordinary meaning to hold that the words as used were not designed to charge and impute unworthy motives, dishonorable conduct, and a want of integrity to this court, as has already been shown in a former part of this opinion. We should stultify ourselves as judges to accept the construction which respondents now seek to give their language. We do not believe, nor can we, for the purpose of escaping an unpleasant responsibility, affect to believe, that persons capable of writing such articles did not intend to convey the meaning which their own words import. The rule is elementary, that a person is presumed to intend the natural and probable consequences of his own voluntary act; and such rule is certainly applicable to words deliberately written and printed.

12. The learned counsel for respondents complains that the law relating to contempts by newspaper publications, like the law of libel, is very uncertain; and that there is a want of uniformity in the precedents and adjudicated cases. It is true, the adjudicated cases are widely variant; but this is no fault of the law. It results rather from the fact that the forms of words and other methods by which the motives and integrity of courts and individuals may be assailed and maligned, are so numerous that it is impossible that the law should be more specific. It would be idle to declare that particular words or a particular method of defamation should be unlawful, so long as other words and other methods equally defamatory may be resorted to.

But we need not prolong this opinion. We are confident that respondents have for a long while understood the law relating to this subject, and that they have deliberately disregarded it in this instance. They had no reason for imputing dishonorable conduct or a want of integrity to this court in respect to the Connor case, and they knew they had no reason for so doing. Nevertheless, they made such imputations, and suffered the same to be repeated in their newspaper. Where a wrongful act is willfully done, the law

presumes the wrongdoer to have been actuated by motives of malice. Knowing the customary forbearance of the courts in such matters, respondents doubtless thought this court would not undertake to protect itself from their assaults. Notwithstanding their attitude, we have no desire to exercise great severity in the present case. We see no necessity for exhausting the power of the court in the present instance.

But it must be understood that this court will not shrink from the responsibility, however onerous, of protecting the administration of justice from assaults of the kind under consideration. Attacks upon the judicial integrity of this court calculated to prejudice the rights of litigants in particular cases, or to impede, obstruct, or embarrass the administration of justice, cannot always be suffered to pass unnoticed. If we were to forbear too much in matters of this kind, the confidence of the people might well be impaired in the firmness and stability, if not in the integrity, of the judiciary. As was said by Chief Justice Lawrence in deciding the case of *The People v. Wilson*, 64 Ills. 217, " We have personally felt great reluctance to taking notice of the publication, but our consciousness of the mischief that may be done in embarrassing the administration of justice, and impairing the moral authority of the judiciary throughout the state, if this article is to stand as an unpunished precedent, has compelled us to issue the rule, and now compels us to order an attachment."

The facts and circumstances set forth in respondents' answer will not be disregarded so far as the same are entitled to any weight as matters of mitigation; but the answer is not, in the opinion of the court, sufficient in law as a defense or as a justification of the matters complained of against respondents. It is therefore ordered by the court that a writ of attachment issue in due form for the arrest of respondents and each of them ; and that they and each of them be brought forthwith before the court that it may be inquired of them if anything further they have to say why they should not be found and adjudged guilty as charged, and punished accordingly.

CHIEF JUSTICE HAYT and MR. JUSTICE GODDARD concur in the foregoing opinion.

### FURTHER PROCEEDINGS.

The foregoing opinion having been announced, the writ of attachment was issued, and respondent Stapleton was brought before the court in obedience thereto. In behalf of respondent Cooper, it was said by his counsel that he was temporarily absent from the state, and leave and time were asked in behalf of respondents to present something further in writing in their behalf. A brief time was granted, and thereupon respondent Stapleton presented the following:

"Comes now William Stapleton, respondent above named, and for further answer and explanation touching the offense whereof by the opinion of this honorable court he has been adjudged guilty, respectfully submits the following:

"That he has read the opinion heretofore in this cause filed and is now convinced that the objectionable language referred to therein was fairly and reasonably open to the construction put upon it by this honorable court, though no such construction was intended or thought of when the same was written and published. That he does not believe, and never did believe, that this court or any member thereof, was in any manner improperly influenced in the Connors case, or in any other case. That the articles referred to in the opinion were written hastily, incident to the hurry of the publication of a morning paper, and at a time when there was intense feeling occasioned by the action of a member of the city council of Denver in the organization of the board of aldermen.

"That the purpose of these articles was solely to call public attention to the conduct of parties occupying no official position whatever in connection with this court, and to prevent further improper influence upon the organization of said board of aldermen. That there was no intention to reflect in any manner upon this court, or upon any member thereof. That he very much regrets having permitted the

publication of language seemingly, though unintentionally, calculated to question the motive or independence of this court, or the honorable justices composing the same. That there was no desire whatever to interfere in the slightest degree with the due and proper administration of justice. That respondent realizes the great importance of having a pure, unimpeded and dignified administration of justice by this and all other courts. That neither respondent nor any one else connected with the ownership, publication or management of said paper, has ever intentionally or knowingly consented to the insertion therein of matter in any way tending to annoy or embarrass this court in the performance of its judicial duties. And that in connection with the subject-matter of the articles in question there was never any justification for adverse criticism of this court or for reflection upon the conduct of either of its members.

" Upon the foregoing statement and other matters herein appearing of record, respondent respectfully submits to the finding and judgment of the court.

"William Stapleton."

" State of Colorado,   )
" County of Arapahoe. }  ss.

" Subscribed and sworn to by the said William Stapleton, respondent in the above entitled cause, before me, a notary public, in and for said county and state, this 18th day of May, 1893                    Cyrus E. Cooper,
        (seal)                    " Notary Public."

Per Curiam.    In view of the acknowledgment, retraction and regrets now expressed by Mr. Stapleton in writing and under his oath, accompanied by the assurance that the matters thus expressed will be published by him as widely and conspicuously as the articles complained of, it is the opinion of the court that, in the present instance, further proceedings against him are unnecessary, and that severity of punishment is not required.

It is therefore ordered by the court, all the justices con-

curring, that this proceeding be dismissed as to Mr. Stapleton, and that he be discharged upon payment by him of his share of the costs herein ; and further, that the proceeding stand continued as to respondent Cooper until such time as he can be brought before the court.

Subsequently, respondent Cooper, by leave of the court, presented his further answer under oath, which, omitting the formal parts, was as follows :

" That this respondent did not cause or procure the publication of any of the objectionable articles mentioned in this proceeding, and that he had no knowledge whatever of any or either of them until after the same had been published in *The Republican*. That he did not nor has he ever approved of said articles or either of them so far as the same have any reference whatever to this honorable court. That he very much regrets the publication of language seemingly, though unintentionally, calculated to question the motive or independence of this court, or the honorable justices composing the same. That this respondent has no desire whatever to interfere in the slightest degree with the due and proper administration of justice, and that he realizes the importance of having a pure, unimpeded and dignified administration of justice by this and and all other courts. That this respondent has never intentionally or knowingly consented to the insertion in said paper of matter in any way tending to annoy or embarrass this court in the performance of its judicial duties, and that in connection with the subject-matter of the articles in question there never was, as respondent believes, any justification for adverse criticism of this court, or for reflection upon the conduct of either of its members."

And thereupon it was ordered that upon the payment of the residue of the costs herein, Mr. Cooper be discharged, and this proceeding dismissed.

*Dismissed.*