STATE OF NEBRASKA V. BEE PUBLISHING COMPANY.

FILED JUNE 7, 1900. No. 11,399.

1. **Constructive Contempt: COMMON LAW: STATUTE.** The common law power of the courts to punish for constructive contempts is, in this state, expressly confirmed by legislative enactment.

2. ————: **RIGHTS OF LITIGANT.** Every litigant is entitled, not only to a just decision of his cause, but to a decision rendered by a court which is, at the time, entirely free from physical and moral coercion.

3. ————: **FREEDOM OF PRESS: CONTROL OF JUDICIAL ACTION.** The press and the public have the right to freely discuss, criticise and censure the decisions of the courts; but they have no right, while a cause is pending, to attempt, by threats or other form of intimidation, to control judicial action.

4. ————: **NEWSPAPER CORPORATION.** A newspaper corporation which deliberately seeks to influence judicial action by the publication of articles threatening the judges with public odium and reprobation in case they decide a pending cause in a particular way, is guilty of constructive contempt,

ORIGINAL jurisdiction. This was a criminal proceeding in contempt, brought on the relation of the attorney general. The offending articles appear in the opinion. The defendants, upon their request, were awarded separate trials, but not as a matter of right. The defendant the Bee Publishing Company answered, admitted the publication; but entered a plea of *non possemus*, by reason of being a corporation. It also pleaded, in justification, that the matters published were items of news, and of common report at the time of publication. It further pleaded ·that the case commented upon in the offending article was *res adjudicata*. The defendant Edward Rosewater, in open court, admitted the publication of the offending articles, and that he was the editor of the *Omaha Bee*. He also waived his constitutional right, and consented to be sworn as a witness on behalf of the state. He was sworn accordingly and testified, *inter alia*, on his own motion and on cross-examination by Mr. Oldham, to the following effect, that is to say: That witness dictated the article first.set out in the information, but had no knowledge of the other articles until after the citation herein was served upon him; that Mr. Connell, of counsel in the case of *State v. Kennedy*, had shown him his brief for the purpose of editorial comment as witness supposed; and such brief was the occasion of the article which he had dictated. In general terms, he denied any interest in the transaction but the public good. The object of the articles was to reach public opinion and through it the court. The court held that it would take judicial cognizance of its own records, and that the action of *State of Nebraska v. Kennedy* was then pending before the court. Both cases were submitted upon the pleadings and proof and argued together. *Bee Publishing Company, defendant, convicted and fined $500 and costs.*

*Willis D. Oldham, Deputy Attorney General*, for the state, said: This was an information filed on behalf of the state. The defendants were, respectively, the editor and

publisher of the *Omaha Bee,* a newspaper with an exten-
sive circulation within the jurisdiction of this honorable
court. The articles published related to a matter now
pending before this court for a determination. They
were evidently designed to influence the decision. It
mattered not whether they would have that effect. The
question was not what would the effect be, but what
was their designed effect. In law, every man is pre-
sumed to intend the natural and probable consequences
of his own acts; and his intent was not to be gathered
from his plea of the baby act. *I did not mean to* would
pass very well in the nursery, but it had no place in a
court of justice. *Ignorantia facti excusat*—ignorance of
fact excuseth—was hornbook law. But the maxim,
*Ignorantia juris quod quisque tenetur scire, neminem excusat*
—ignorance of law, which every one is held to know, ex-
cuseth no one—was black letter law, founded on the
gravest reasons of public policy. If the defendant Rose-
water was ignorant of the fact that the case of *State
v. Kennedy* was pending, the ignorance of that fact might
excuse him. But he could not be ignorant thereof. He
himself testified that Connell had shown him his brief,
for the purposes of editorial comment; and that brief
had been the basis of the article which he dictated. The
defendant Rosewater, having knowledge of the fact,
must know the law which regulated his own conduct.
Rosewater was the vice-principal of the Bee Publishing
Company, and his knowledge was theirs. The liability
of a corporaton in a case of this kind was settled in the
Massachusetts case cited by the state. It mattered not
whether or not the conduct of the governor and the at-
torney general had been correct. The court would take
care of that. Louis XVI. was justly condemned to the
guillotine; but that righteous condemnation did not ex-
cuse the merciless rabble of Parisian *canaille* and *sans-
culottes* that clamored for his death in the galleries of
the national convention; and sought to forestall its judg-
ment.

In the mind's eye, we might behold the ancient counterpart of the subject of this contempt proceeding when we reflect on another scene which took place about one thousand eight hundred and sixty-seven years ago (according to Usher), and which is being acted this year in a little town of the Bavarian Tyrol—a mob howling for the blood of the Man of Nazareth. The cowardly procurator tried to effect a change of venue, on the court's own motion, to Herod, tetrarch of Galilee. When this device failed, he disregarded the prudent advice of Mrs. Pilate, and yielded to what our friend from Omaha would call an enlightened public opinion. It was the idea of keeping any deliberative body free from this outside clamor that made that great commoner, Thomas B. Reed, threaten to clear the galleries when speakers were applauded.

If a plea of *res adjudicata* could be successfully made in *State v. Kennedy*, that fact made it no less an action pending. You might as well say that because a common traverse or *nil debet* could be successfully maintained against a declaration upon an action of debt there was no action pending.

The defendant Rosewater said that only four states had sustained actions for constructive contempt in cases of this kind. The speaker had found forty-seven decisions in the states and territories; and had not reached the bottom yet.

The state cited: *Ex parte Barry*, 85 Cal., 603; *People v. Stapleton*, 18 Colo., 568; *In re Chadwick*, 109 Mich., 588; *People v. Wilson*, 64 Ill., 195; *Territory v. Murray*, 7 Mont., 251; *Commonwealth v. Kneeland*, 20 Pick. [Mass.], 206; *Myers v. State*, 46 Ohio St., 473; *State v. Morrill*, 16 Ark., 384; *In re Woolley*, 11 Bush [Ky.], 110; *In the Matter of Moore*, 63 N. Car., 397; *Telegram Co. v. Commonwealth*, 172 Mass., 294; *State v. Circuit Court*, 38 L. R. A., 558; Blackstone, book 4, p. 283; *Respublica v. Oswald*, 1 Dall. [U. S.], 319; *Ex parte Jones*, 13 Ves. [Eng.], 237; American Law Review, May, 1900; *State v. Faulds*, 17 Mont., 140.

The authority to punish for contempt is a necessary incident, inherent in the very organization of all legislative bodies, and of all courts of equity, independent of statutory provisions. *Tenney's Case*, 3 Fost. [N. H.], 162; *State v. Matthews*, 37 N. H., 453; *Anderson v. Dunn*, 6 Wheat. [U. S.], 204; *State v. Copp*, 15 N. H., 212; *Mariner v. Dyer*, 2 Greenl. [Me.], 165; *Stewart v. Blaine*, 1 McArth. [D. C.], 453; also *Stewart v. Ordway*, decided therewith; *Yates v. Lansing*, 9 Johns. [N. Y.], 396; 1 Burr's Trial, 352; *Ex parte Adams*, 25 Miss, 883; *People v. Freer*, Coleman & Caine's Cases [N. Y.], 283.

Stewart Rapalje, a learned law writer of New York city, published in 1884 a work on contempt, in which he says: "It is conclusively settled by a long line of decisions that at common law, all courts of record have an inherent power to punish contempts committed *in facie curiæ*, such power being essential to the very existence of a court as such, and granted as a necessary incident in establishing a tribunal as a court. And this power extends to the punishment of willful contempts committed by corporate bodies as well as individuals. Each superior court being the judge of its own power to punish contemnors, no other court can question the existence of that power, and the facts constituting the contempt need not be set out in the record." Rapalje, Contempts, p. 1.

Publications which have a tendency to prejudice pending causes can not be permited. *Pool v. Sacheverel*, 1 Williams P. [Eng.], 675; *Farley's Case*, 2 Ves. Sr. [Eng.], 520; *Anonymous*, 2 Atkyns [Eng.], 469; *Respublica v. Oswald*, 1 Dall. [U. S.], 319; *Bayard v. Passmore*, 3 Yea. [Pa.], 438; *In the Matter of Sturoc*, 48 N. H., 428.

In *Pool v. Sacheverel*, supra, an advertisement in a newspaper, offering a pecuniary reward for legal proof of marriage, was held contempt, as tending to subornation of perjury. In *Sturoc's Case*, supra, the offense was a written communication left at the office of a newspaper published at the shiretown. The article appeared the

same week that the *nisi prius* court was in session, and at that session the cause was pending which was the subject of the article. The editor testified that the writer said he was not particular that the article be published that week, and did not care if it was not published at all. The defendant disavowed any ill-intention; denied that he knew the action was pending at that session; and the court gave him full credit, but imposed a fine of $30 to show that such publications, in such circumstances, were illegal and not to be tolerated.

The intention of a publication will not justify it, if it be, in the opinion of the court, contempt against the court. *People v. Freer*, Coleman & Caine's Cases [N. Y.], 283.

*Edward Rosewater*, appearing in his own behalf, said: The proceeding in contempt was an arbitrary one, borrowed from monarchical times and countries; it was inimical to the genius of our government and foreign to the spirit of our institutions. There never had been an original proceeding in contempt before the supreme court of the United States, or before forty of the supreme courts of the states of the Union. A court should be chary in the exercise of a power whose abuse might tend to cripple the power of the press as a guide of public opinion. The press had a sacred duty to perform in such matters, for a faithful performance of which it would be held to a strict account before the great tribunal of mankind. If an article was not libelous, disrespectful or meddlesome *per se*, and if this character did not appear upon its face, unaided by the innuendoes of a criminal pleader, the defendant should not be convicted of a contempt. Such was the sound rule, and such had been the former holdings of this court. The defendant admitted that, if an action was pending before the court, a journal had not the right, directly or indirectly, to attempt to influence the decision of the court. But in this case no action was pending. What was the history of the trans-

action? The supreme court, in *State v. Moores*, 55 Nebr., 480, had declared that part of the act of 1897 (Compiled Statutes, ch. 12*a*) which vested in the governor the power to appoint police commissioners in cities of the metropolitan class void. It had drawn a red line through that part of the law, and it was a complete erasure; that part of the act no longer existed. The decision was *res judicata*. In *State v. Kennedy* there was an attempt to revive a question forever put to rest by the decision in *State v. Moores, supra*. If that case was still pending, as much any other case heretofore decided by this august tribunal might be regarded as pending. It was conceded by the state that a journal might comment upon a case after the decision had been made, being answerable only in action for libel, where it could have the benefit of a trial by jury. If *State v. Moores* could still be regarded as pending, then any person could commence a proceeding to open up any ancient case; and have any person commenting upon this extraordinary proceeding committed for contempt. If any one was guilty of a contempt of this court, it was the governor of the state, who, in the face of a decision made two years ago, had appointed a board of police commissioners without authority of law, and the attorney general, who had commenced the strange proceeding in *State v. Kennedy*. The legislature of 1899 had created an insurance bureau, making the governor insurance commissioner, with power to appoint a deputy. This law your honors have decided unconstitutional. His former deputy is now an officer of your court. Why does his excellency not appoint a new deputy and commence *quo warranto* proceedings against the auditor? If he did this, would the editor of the *Omaha Bee* be committed as for contempt for commenting on the absurdity of such proceedings? This court, by repeated rulings, had held itself to be a court of enumerated powers and limited jurisdiction. It was the creature of the constitution. It possessed no power not given by its creator or which was not necessarily incident to power actually

granted. The court had no common law jurisdiction in contempt cases. *Kilbourn v. Thompson*, 103 U. S., 168.

*Edward W. Simeral*, for the Bee Publishing Company, said in part: The court could go to its own volumes for precedents; but these precedents did not support the contention of the state. They said in so many words that, if an article was not libelous on its face,—if it required an innuendo to apply it to the court, no contempt would lie. The attorney general did not call attention to these decisions, but counsel for defendant would, and cited: *Rosewater v. State*, 47 Nebr., 630; *Percival v. State*, 45 Nebr., 741.

The first case cited by the state is *People v. Wilson*, 64 Ill., 195. The deputy attorney general did not note the fact that that case had been overruled in *Storey v. People*, 79 Ill., 45.

*Constantine J. Smyth, Attorney General*, on behalf of the state, said the case was presented to the court by the defendants on false issues. It had been said that it involved the liberty of the press. But it did nothing of the kind. What was meant by the liberty of the press? Our constitution told us in section 5, article 1. The liberty of the press then was no greater than the liberty of the individual, and that liberty was to speak, write and publish on all subjects, being responsible for the abuse of that liberty. It was in contradistinction of the system, described by George Kennan as existing in Russia, where they had a press censor who culled manuscripts before they went to press. The defendants in this case had written and published without let or hindrance, so far as this case was concerned; and, therefore, the liberty guaranteed to them by the constitution had not been abridged or interfered with in the least. The question to be determined was not, therefore, whether these defendants might print and publish, but whether they had abused this liberty. If they had, and had thereby vio-

23

lated a law of the state, why should they not be held responsible? Did they belong to a privileged class, a class which may violate the law with impunity? They may have formed that opinion. If so, it was time they were awakened from this dream, and brought face to face with the reality that they had no license to trample upon the law and to violate the rights of parties litigant. The law against contempt was not, and never was, a part of kingly prerogative. It was not a judge-made law. On the contrary, it was as old as *magna charta,* had its birth with the choicest principles of common law, and was as salutary as any other of the great principles of institutional law. The power of courts of superior jurisdiction, created by the constitution, to punish for contempt is necessarily inherent in such court. "A court," said the supreme court of Wisconsin in *State v. Circuit Court,* 38 L. R. A., 554, 558, "without this power would be at best a mere debating society, and not a court. These principles have been recognized in all courts from time immemorial." Blackstone, in his fourth book, page 238, mentioned among the instances of contempt of court those committed away from the presence of the court by parties writing or speaking contemptuously of the court or judges acting in their judicial capacity. The supreme court of New Jersey, in *In re Cheeseman,* 49 N. J. Law, 115, said that words uttered or published outside of the courts and designed to bring contempt upon the courts in the exercise of their judicial functions, or to pervert, in any pending cause, the due administration of justice, have always constituted a contempt of court. Judge Freeman, one of the most noted American law writers, said in a note to *Percival v. State,* 50 Am. St. Rep., 573: "It is also conceded that the efficiency of the courts and the stability of government, at least among a free people, are dependent upon their confidence in the integrity of the courts and their ability and willingness to deal impartially with the questions committed to their consideration; and that to impute to the courts, or the

judges presiding over them, corrupt motives in the discharge of their judicial functions, in cases still pending before them, is a contempt of court, and may be punished as such."

The attorney general said he could not better portray the viciousness of the procedure adopted by the defendants than by quoting the following apt language. Mr. Justice Brown, of the supreme court of the United States, in an address recently delivered before the New York State Bar Association, and published in the May number of the American Law Review, quoted Franklin's arraignment of this usurped power of the "court of the press," Franklin said: "It may receive and promulgate accusations of all kinds, against all persons and characters among the citizens of the state,. and even against all inferior courts; and may judge, sentence and condemn to infamy, not only private individuals, but public bodies, with or without inquiry or hearing, at the court's discretion. This court is established in favor of about one citizen in five hundred, who, by education or practice in scribbling, has acquired a tolerable style as to grammar and construction.  *  *  *  This five-hundredth part of the citizens have the privilege of accusing and abusing the other four hundred and ninety-nine parts at their pleasure; or, they may hire out their pens and press to others for that purpose." After saying that the court is not permitted to know the name of his accuser, or of seeing his witnesses, he says: "Yet, if an officer of this court receives the slightest check for misconduct in this his office, he claims immediately the rights of a free citizen by the constitution, and demands to know his accuser, to confront the witnesses, and to have a fair trial by a jury of his peers." Justice Brown adds: "As this article was written 110 years ago, it is evident that the abuses of which we complain are of long standing." 34 Am. Law Review, 323.

With regard to the power of the court the attorney general said: This court was not compelled to look to the

common law only for its power to punish the defendants if they are found guilty of contempt. The people of this state, through their legislature, have conferred that power in express terms upon your honors. Section 669 of the Code says that "Every court of record shall have power to punish by fine and imprisonment, or by either, as for criminal contempt, persons guilty of any of the following acts: * * * Any willful attempt to obstruct the proceedings, or hinder the due administration of justice in any suit, proceedings or process pending before the courts." What was meant by the due administration of justice? It was administration according to the rules that have generally obtained in courts of justice. Both parties must have a right to be heard. Whatever was intended to influence the decision must be presented in court in accordance with rules established for the government of such matters. No analysis was necessary of the articles alleged to be contemptuous in this case to show the purpose for which they were published. They could have but one purpose, and that was to create a prejudice in the public mind against one of the parties to a pending suit—to force the court to render a certain decision therein and to give the public to understand that the court, if it decided in favor of one of the parties, would be influenced by improper motives. It was part of that purpose to impute scorn and reproach to two of the judges composing this court, and thus lessen the respect in which this court was held by the people of the state, and to destroy the confidence and integrity, the ability and the willingness of the members of this court to deal impartially with questions committed to its consideration. It was not meant that the articles had that effect. But they did not necessarily have to have such an effect in order to be contemptuous. They were calculated to have that effect, and could have been written for no other purpose. And hence they come within all the definitions of what constitutes contempt of court.

SULLIVAN, J.

This proceeding for contempt, instituted by the attorney general at the request of the court, is based upon certain newspaper articles relating to the case of *State v. Kennedy*, 60 Nebr., 300, which was, at the time of the publications, pending before us for decision. The defendant is a corporation engaged in the publication of a newspaper which has a general circulation throughout the state. The editor is Edward Rosewater, who has also been cited to show cause why he should not be punished for contempt, and who has, at his own request, been awarded a separate trial. Some of the articles were obviously designed to prevent one member of the court from participating in the decision, while others threatened two members of the court with public odium and reprobation in case they should give judgment in favor of the state. One article, which was entitled "Worthy of Serious Consideration," after declaring that Judge HOLCOMB, before coming to the bench, had expressed an opinion upon the question involved in the *Kennedy Case*, proceeds as follows: "Having prejudged the case, Judge Holcomb must certainly realize that it would be in conflict with the spirit, if not the letter, of the constitution and the laws for him to use his judicial position to sustain himself in his former declarations. To set the precedent by participating in this case, after having formed and expressed an opinion, would lower the standard of the tribunal in which impartial and equal justice is expected to be administered and whose unbiased interpretation of the constitution is the bulwark of our free institutions." Soon afterward the following article appeared: "Fusion ward heelers in Omaha are again giving advance tips to the effect that the fusion judges of the supreme court will hand down a decision at their sitting two weeks from next Tuesday, ousting the present fire and police commissioners and seating the pretended board appointed by Governor Poynter. Has it not come to a pretty pass

when supreme court decisions are retailed in this manner in third ward resorts and street corners?" A little later there was published an article entitled "Politics in the Courts" (reprinted from the *Grand Island Journal*), which is as follows: "It is reported that the fusionists in Omaha are preparing to profit by the action of the fusion supreme court when it reverses the ruling of the court in the fire and police commission case. If Judges Sullivan and Holcomb lend their aid to the scheme of the Omaha bunco steerers, they will be a disgrace to the legal profession and the laughing stock of every lawyer in the land. It is to be hoped that the fusion members of the supreme court will prove more manly than their heelers at the metropolis would have them be." Another article, entitled "The Ethics of Justice," published May 8, 1900, is too long for insertion in this opinion, but its character is sufficiently indicated by the following excerpt: "A due appreciation of the sacred duties of the judicial office and the inviolable right of every citizen to speedy and impartial justice should counteract all pressure of political partisans anxious to use the judicial ermine to cloak their schemes for political power and preferment. If it does not, then Nebraska's motto, 'Equality before the law,' becomes a delusion and a snare." Defendant appeared in court by counsel and defended the accusation against it upon the grounds: (1) that no disrespect to the court, or to any member of the court, was intended; (2) that the case of *State v. Kennedy* was not pending; and (3) that the publications were made with good motives, and were not calculated to obstruct the due administration of justice.

The *Kennedy Case* was pending; of that we have judicial knowledge, and the defendant must surely have known that the case was in court and undetermined, for it appears that the attorney for the respondents brought his brief to Mr. Rosewater's office and that the article headed "Worthy of Serious Consideration" immediately followed the meeting between the editor and the lawyer. It also

appears from the evidence that the article was written for the express purpose of calling public attention to the alleged impropriety of Judge HOLCOMB participating in the decision of the court. The first and third defenses are puerile. They amount only to a denial that the defendant intended to violate the law. Under the conceded facts the course pursued by it was indefensible; its conduct is not susceptible of an innocent construction. The statute declares that any willful attempt to obstruct the proceedings, or hinder the due administration of justice in any suit, proceeding or process pending before any court shall constitute a criminal contempt and be punishable as such. Code of Civil Procedure, sec. 669. This statute is merely declaratory of the law as it has existed for hundreds of years. It is a legislative recognition of the authority of the courts to deal in a summary manner with persons who do any wanton, deliberate or intentional act calculated to embarrass them in the discharge of their important duties. In the history of American jurisprudence there can be found no case in which this power has been harshly or oppressively exercised by a court of final jurisdiction. Indeed, such courts have not often called publishers to account for constructive contempts, because it has rarely happened that a public journal, wielding any considerable influence, has deliberately employed outlaw methods in attempting to control judicial action. The exceptional cases which we have examined are these: *People v. Stapleton*, 18 Colo., 568; *People v. Wilson*, 64 Ill., 195; *In re Hughes*, 43 Pac. Rep. [N. Mex.], 692; *State v. Morrill*, 16 Ark., 384; *State v. Faulds*, 17 Mont., 140; *State v. Frew*, 24 W. Va., 416.

Cases of this kind originating in the lower courts are very numerous. We will not take the time to cite them or any of them. As said by the supreme court of Iowa in the case of *Field v. Thornell*, 106 Ia., 7, 15, it seldom happens "that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary, or seek to control or improperly influence its conclusions."

We have, of course, no desire to restrain, in the slightest degree, the freedom of the press or to maintain the dignity of the court by inflicting penalties on those who may assail us with defamatory publications. Our decisions and all our official actions are public property, and the press and the people have the undoubted right to comment on them and criticise and censure them as they see fit. Judicial officers, like other public servants, must answer for their official actions before the chancery of public opinion; they must make good their claims to popular esteem by excellence and virtue, by faithful and efficient service and by righteous conduct. But while we concede to the press the right to criticise freely our decisions when made, we deny to any individual or to any class of men the right to subject us to any form of coercion with the view of affecting our judgment in a pending case.

In the Iowa case above cited it is said, p. 15: "Courts are constantly passing on questions affecting the life and liberty of the citizen, as well as the rights of property; and the freedom of the judiciary to investigate and decide is quite as important to the well-being of society as the freedom of the press." "Men," said one who knew them well, "are flesh and blood and apprehensive." Few stand unmoved by the clamor of the multitude. Various motives, of course, conspire to make people deny, and even to disguise from themselves, the fact that they are amenable, in any degree, to the force of popular opinion. But it is folly to deceive ourselves, and it is futile to attempt to deceive others. Threats of public clamor have before now swayed the judgments and flexed the purposes of resolute men; and it will be well to remember that what has happened may recur. Men have in the past yielded to the demands of an angry populace, and it is quite possible that they may yield again. Moral fiber is not stronger now than it ever was before. Courts are charged with the function of administering justice, and it is their duty not only to give to every suitor his de-

mandable right, but to give him assurance that no
banned and hostile influence shall operate against him
while his cause is under consideration.  A litigant is en-
titled not only to a just decision, but to a decision alto-
gether free from the suspicion of having been coerced.
Nothing else will satisfy him; nothing less can fill the
measure of his expectations.  He has no standard with
which to gauge judicial firmness; and if the court has
been exposed to influences calculated, as in the *Kennedy
Case*, to tell against him, he will not know whether an
adverse decision is the voice of the law or an echo of the
mob.  Our views upon this matter are well expressed in
the following excerpt from the opinion of Lawrence,
C. J., in *People v. Wilson, supra*, p. 214: "A court will, of
course, endeavor to remain wholly uninfluenced by publi-
cations like that under consideration, but will the com-
munity believe that it is able to do so?  Can it even be
certain in regard to itself?  Can men always be sure of
their mental poise?  A timid man might be influenced to
yield, while a combative man would be driven in the op-
posite direction.  Whether the actual influence is on one
side or the other, so far as it is felt at all, it becomes
dangerous to the administration of justice.  Even if a
court is happily composed of judges of such firm and
equal temper that they remain wholly uninfluenced in
either direction, nevertheless a disturbing influence has
been thrown into the council chamber which it is the wise
policy of the law to exclude."  Equally pertinent are the
following remarks of Elliott, J., in *People v. Stapleton,
supra*, p. 580: "Judges are human; they are possessed of
human feelings; and when accusations are publicly
made, as by a newspaper article, charging them directly
or indirectly with dishonorable conduct in a cause pend-
ing before them and about to be determined, it is idle to
say that they need not be embarrassed in their considera-
tion and determination of such cause, they will inevitably
suffer more or less embarrassment in the discharge of
their duties, according to the nature of the charges and

the source from which such charges emanate. When a judge tries and determines a cause in connection with which public charges against his judicial integrity have been published, the public as well as parties interested are frequently led by the publication of the charges to distrust the honesty and impartiality of the decision; and thus confidence in the administration of justice is impaired. It is not only important that the trial of causes shall be impartial, and that the decisions of the courts shall be just, but it is important that causes shall be tried and judgments rendered without bias, prejudice, or improper influence of any kind. It is not merely a private wrong against the rights of litigants and against the judges—it is a public wrong—a crime against the state—to undertake by libel or slander to impair confidence in the administration of justice. That a party does not succeed in such undertaking lessens his offense only in degree."

We feel quite sure that the publications here in question have not in the least deterred us from discharging with fidelity our duty in the case of *State v. Kennedy*. But they were manifestly intended to overawe and intimidate us. They appear to have been put forth for the purpose of preventing a decision in favor of the state. They were, under the circumstances, palpable acts of journalistic lawlessness, calculated to weaken the independence of the court and destroy confidence in its judgment. To justify them is to deny the supremacy of the law and assert the doctrine of newspaper absolutism. To admit that publishers may promote their interests in pending litigation by resorting to methods not available to others, is to strike down our much vaunted principle of "equality before the law" and to declare that journalists, who choose to become malefactors, are a privileged class and entitled as such to go unwhipped of justice. But the law recognizes no such distinction; it never has recognized such a distinction. It accords to publishers no rights but such as are common to all. They have just the

same rights as the rest of the community have, and no more. *King v. Root*, 4 Wend. [N. Y.], 113. A distinguished judge has said: "A man who speaks in a newspaper has no greater right than he who speaks out of it. A newspaper is no sanctuary behind which a person can shield himself for breaking the laws of the land."

We have not acted in this case out of any spirit of resentment. Indeed, we have no reason to feel specially aggrieved, for the offensive articles do not charge us, or any of us, with official misconduct. Their natural tendency, however, was to interfere with and obstruct the due administration of justice; and it was the unanimous opinion of the court, when the citation issued, that it was our duty to take notice of them and call the defendant to account. And it is still the judgment of the members of the court who take part in this decision that we acted wisely, and that we could not have ignored the defendant's attempt to coerce our decision without being guilty of a craven faithlessness to duty. Whatever may have been the motive of the publishing company, its conduct was plainly unlawful. The articles in question did not, it is true, bring about a miscarriage of justice in the *Kennedy Case*, but their manifest tendency was in that direction. We can not escape the conclusion that the necessity for this proceeding has resulted from the fact that the services of the journalist were enlisted by interested parties to press upon the attention of the court, in a very important case, illegitimate arguments—reasons for a decision which, it is well understood, counsel could not, with propriety, advance. The defendant is guilty as charged in the information, and it is the sentence of the court that it pay a fine of $500 and the taxable costs. It will, however, have leave to move for a modification of the judgment during the present term upon showing that it has published a fair and truthful account of the cause and occasion for this proceeding.

Since the above was written it has been suggested that the testimony of Edward Rosewater was not intended to

be regarded as a part of the proceedings in this case. Granting that, our conclusions must remain unchanged. The guilt of the defendant is conclusively established without considering Mr. Rosewater's testimony.

NORVAL, C. J., for the reasons heretofore stated by him, having refrained from taking part in the hearing, offered no opinion.

