## In re EGAN.

The power of the Supreme Court to admit and disbar attorneys is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion.

Criticism of judicial officers, made after the termination of the cause, is not ground for disbarment of an attorney, nor for punishment for contempt.

Liberty of speech and of the press does not·warrant an attorney of more than 20 years' standing, either before or .after disbarment, to prosecute a campaign of vilification of the courts or judges of the state, exceeding respectful, fair and candid criticism, and descending to mere scandalous abuse.

A matter is deemed to be pending until it reaches a final determination in the appellate court.

Liberty of the press does not authorize a newspaper to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial.

Petitioner, an attorney of 20 years' standing, contracted with his client of an hour's acquaintance, whereby he was to receive $10,000, which was all the client's assets, for defending her against the charge of murder, and thereafter openly asserted that she was guilty of murder.  An action was then instituted against him to recover the client's property, and, on his being defeated therein, he entered into a systematic course of vilification of the courts, and all who did not agree with him, through a newspaper, and, being later retained to prosecute another for murder, asserted through numerous published articles that proceedings then pending against him for disbarment were instituted to prevent his success in that prosecution, charging impropriety. and corruption against the judges of the Supreme Court. In proceedings subsequently instituted, after his disbarment, for his readmission to the bar, he still insisted that he had neither said nor published anything intended to discredit or disgrace the court, and that he was aware that it was the duty of every man to preach and practice respect to the court and obedience to its orders and decrees, but that he had simply attacked individuals as such.  **Held**, that peti-

tioner was not shown to be a person of good moral character, required by Pol. Code, § 686, as a condition precedent to admission to the bar.

(Opinion filed, Dec. 1, 1909.)

Application by George W. Egan to be admitted to the Bar. Application denied.

*Geo. W. Egan,* in pro. per. *Park Davis, A. B. Kittredge,* and *Henry Robertson,* for remonstrants.

WHITING, J. This is an original proceeding brought in this court by the applicant, Geo. W. Egan, a regularly admitted practitioner in the courts of the state of Iowa, who, having once been disbarred by the decision of this court as reported In re Egan,, 22 S. 'D. 355, 117 N. W. 874, again seeks admission to the bar of this state. His original application for admission, made in October, 1907, was resisted by the Bar Association of Minnehaha county; the applicant being then, as now, a resident of the city of Sioux Falls, in said county. The grounds for such opposition are fully stated in the opinion in the above case. The records herein show that the applicant was conditionally admitted, and that, upon the happening of the event stated in such condition, the Bar Association renewed its opposition to this applicant, and the order of disbarment followed. We refer to the opinion in the above case for a statement of the facts then before the court.

This order of disbarment has since remained in full force and effect. On June 22, 1909, the application in this pending proceeding was filed, and September 1st was set as the date for hearing same, at which time the applicant appeared in his own behalf and presented a written argument, which is now among the files in this cause, and has also reduced his closing argument to writing and filed same. The application herein is resisted by the above-mentioned Bar Association, acting through the same committee as in the disbarment proceeding.

The evidence now before us raises a question, not so much as to the intellectual, as to the moral, fitness of the applicant to become a member of our bar. It is with much hesitancy that any court takes up a matter of this nature, involving, as it does, the rights, upon the one hand, of a person already a member of our profession, and, on the other hand, the duties of the court

toward the public.  Whether we sit upon the bench or plead
our client's cause before the bench, we are but lawyers.  Our
duties may be different, and those of one class graver than those
of the other.  We realize what it must mean to one who has
made the study and practice of law his lifework to have the
fruits of all his years of toil denied him by the closing of per-
haps the only door that opens to material success, and to those
pleasures without money value that come to the true lawyer
in assisting in the just administration of law.  As was well said
by the Supreme Court of the United States in Bradley v. Fisher,
13 Wall. 335, 20 L. Ed. 646: "Admission as an attorney is not
obtained without years of labor and study.  The office 'which
the party thus acquires is one of value, and often becomes a
source of great honor and emolument to its possessor.  To
most persons who enter this profession, it is the means of sup-
port of themselves and families.  To deprive one of an office of
this character would often be to decree poverty to himself and
destitution to his family."

    We certainly cannot but be impressed with the great and even
solemn duty we owe to our fellow lawyer on the one hand, and
to the public on the other—the duty to act fearlessly and with
absolute impartiality.  The Supreme Court of the United States
in Ex parte Secombe, 19 How. 9, 15. L. Ed. 565, speaking of
the power to admit and disbar, said: "The power, however, is
not an arbitrary and despotic one, to be exercised at the pleasure
of the court, or from passion, prejudice, or personal hostility;
but it is the duty of the court to exercise and regulate it by a
sound and just judicial discretion, whereby the rights and inde-
pendence of the bar may be as scrupulously guarded and main-
tained by the court as the rights and dignity of the court itself."
Disbarment is not for the punishment of the party disbarred;
neither should denial of admission be resorted to as a punish-
ment for wrong done.  The law provides other remedies.  In Re
Shepard, 109 Mich. 631, 67 N. W. 971, Justice Hooker said in
relation to a disbarment proceeding: "This is not a proceeding
by way of punishment, though the deprivation of the privileges
of an attorney may be a matter of serious importance to a prac-

titioner. It is in a measure necessary to the protection of the public, who have a right to expect that courts will be vigilant in withholding, and, if already given, withdrawing, their certificates of qualification and character upon which the public rely." We concur fully with the sentiment expressed by the applicant himself in his written argument: "This court, representing the judicial majesty of this great state, can have no purpose or object, except to deal fairly between me on the one hand and the people on the other." The applicant in his written argument says: "It is not my purpose or intention to ask this court to retry the disbarment case, which was heard by this then honorable court on the 1st of October, 1908; but it is my purpose and intention to ask this court to carefully examine the testimony, but with the view of saying, as it must say, knowing all the facts and circumstances, both before my disbarment and since, whether or not I am entitled to license to practice law within the confines of this state."

Inasmuch as three members of this court, being a majority thereof, have come to this bench since the opinion in Re Egan, and were not, therefore, advised regarding what appears upon the record therein, we have thought it right and proper to comply with the above request, and have examined very carefully the voluminous record therein, including not only the evidence submitted before the commissioner of this court, but all the files therein. We have done this to see whether the wrong committed by the applicant was of such a nature that, for the protection of the public, we should still deny applicant's prayer. We have examined such record for the further purpose that we might give proper weight to the new evidence that has been submitted to us in this proceeding, which evidence, the applicant's opponents contend, shows the applicant to be unfitted to become a member of this bar, regardless of the conduct shown in the former proceedings.

Before considering the merits of this cause, this court is constrained, from feelings of self-respect, to refer briefly to the nature of the written argument presented to this court by the applicant. We regret to say that, to our minds, it seems to

lack that dignity that one might expect from the pen of a person possessed of the marked ability of this applicant; he being a person who, no matter what his faults and weaknesses, has been wonderfully endowed by nature and study with command of language. We appreciate that the applicant may, and undoubtedly does, feel that he has been wronged by those whom he claims are persecuting him, and that, as a result of such feeling, he may have used language which upon more mature reflection he would regret. He may, indeed, belong to that class referred to by the court in Re Thatcher (Ohio) 89 N. E. 39, in these words: "Unfortunately, perhaps, there are in our profession a few who chafe under an adverse decision, and indulge in utterances which they are only too happy to retract in cooler moments, and this class are unfortunate, it may be, in having adopted a profession which has its successes and failures."

We submit in all kindness that, no matter what the applicant's feelings may be toward his so-called persecutors, no matter how much he may think he has been wronged by the former action of this court, yet it is not showing proper respect to that court, which the applicant says is "representing the judicial majesty of this great state," even if the applicant feels no degree of respect toward a single member of this bench— we say it does not show proper respect—for him in such argument to use the following language, even if the facts stated were material to the issues: "What have I done in this state? I have obeyed the ordinances of the city and the laws of the land. I have paid my debts and met my obligations as a citizen to the best of my ability. What else have I done? I have refused to be bought, bribed, or intimidated. I have convicted a murderess, in the name of her victim, about whose guilt no honest man ever had doubt or question. I have become in a degree a political iconoclast, and helped topple over the graven image of the political boss, and exposed from the platform and the press a bunch of crooks and political shysters so rotten and corrupt that maidens, wandering with their lovers on the banks of the Sioux, have observed the man in the moon holding his nose as he passes

over Sioux Falls." In fact, this written argument is replete with statements, not only absolutely immaterial to the issues herein, but as undignified as the above, and we cannot but feel that it was intended, not so much for the assistance and enlightment of this court, as that it might be hereafter made public and sent broadcast among the people of the state.

The following from such argument seems to us insulting to those members of the court who sat in the disbarment cause: "I am in a position to prove to any reasonable minded man that the accomplishment of my disbarment, based on the said charge (fraudulent conduct in O'Grady Case), was the most wicked and damnable conspiracy that has been executed since Michael Cervetus was burned at the stake and Beelzebub conspired against the laws of God." Applicant has offered no proof of such a conspiracy. If he has such proof, he should have offered it, or else keep silent. If he considered that proof had already been submitted, then he charges those who were members of this court on October 10, 1908, with being not "reasonable minded" men.

But, overlooking these indiscretions of the applicant, and trusting that they were merely indiscretions, and not intended as studied disrespect toward this court, we will take up the merits of his application.

Our examination of the record herein shows many things in the conduct of the disbarment proceedings of which we do not approve. It would seem to us that there was at times too much personal feeling on the part of those moving against the applicant to give to the proceedings that spirit of perfect fairness such a proceeding should have. Great volumes of testimony were offered which the opponents of the applicant must have realized was absolutely immaterial. We refer to testimony received upon the question whether or not Mrs. O'Grady was on October 9, 1907, a person competent to transact business. Counsel must have realized that such evidence was absolutely immaterial, without some proof to show that her incompetency was known to Mr. Egan. No effort was made to supply this necessary connecting proof. There is, however, in said record, ample to sustain everything said by the learned justice who wrote the opinion in the

disbarment case.    It is not our purpose to review such case, but we would briefly call attention to a few matters therein.

Take the undisputed facts.    With no previous knowledge of the merits of the charge against Mrs. O'Grady, except, perchance, such as may have been revealed by newspaper reports, Mr. Egan meets this woman, a perfect stranger to himself.    Without any private conversation with her—the evidence shows he had none, and in his written argument in this court he says he never talked with her alone—and realizing the terrible strain under which one charged with the awful offense of murder must be placed, regardless of her sense either of guilt or innocense, and knowing, as he must, that no person, however strong and rational, could, under such circumstances, where there had been no chance for calm deliberation, not even a chance to reveal secretly to her attorney the true merits of her case, act freely and intelligently, he permits her to enter into the contract for an exhorbitant fee.    We do not hesitate to say that he had no right at that time to make any contract whatsoever as to the amount of his fees.    That should have been left for a later time.    The very law of which the applicant was a disciple would fully protect him.    Furthermore, even to this day, there has been nothing brought to the attention of this court that would justify the applicant at any time to exact an agreement for the payment of such an exhorbitant fee as $10,000, the payment of which would take all that his client possessed and leave her still indebted in a large sum.    Let it be understood, on the other hand that we do not condemn any proper means which applicant might have used on October 9th to get for himself and the bondsmen of his client security for such fees as he might afterwards prove himself entitled to and for the protection of the bondsmen against their liabilities under their bond.

The applicant, in his written argument presented herein, has made certain statements regarding the merits of the charge against Mrs. O'Grady.    These statements are, to say the least, startling, raising the question of the ethical right of applicant to make the revelations contained therein.    He says:    "Who killed John O'Grady?    There never was doubt in the mind of any

person who was familiar with all the facts. The gun was in the house. It had been recently discharged. The shell fitted the gun, and other shells were present. Not a person was or had been about the place but O'Grady and wife. They were alone. They quarreled. Her face was scratched and bleeding. I do not betray the secret of a former client, but state what the facts and circumstances clearly show, when I say she rushed to the closet in which the gun was kept, grabbed it, and shot John O'Grady dead." We have searched the record in the disbarment proceedings in vain to find any evidence tending strongly to show the guilt of Mrs. O'Grady. Such evidence does show that she admitted being alone with her susband on the evening of his death, and that there had been some trouble; but she denied her guilt, and claimed that another party was seen by her to commit the terrible deed. When and where did the applicant learn of the facts which justify this terrible charge against the client whose life and honor he had undertaken to protect for $10,000? Certainly we will not presume for a moment that the applicant learned these facts from the lips of his client, either upon the fateful October 9, 1907, or at any later date, because we must give him credit for knowing that any admission made by her in presence of a person not her attorney would not be privileged, and such person might be called in open court, upon the trial of the charge against this woman, to swear to the statements made by her. The applicant in his written argument says: "May it also be remembered that I never saw or talked with Julia Ann O'Grady alone during her lifetime."

Justice Corson, in the opinion in the disbarment proceeding questioned the professional right of the applicant to contest the question of the incompetency of his client, when such incompetency was raised in the county and circuit courts. Under the evidence then before the court, we admit that different minds might have reached different conclusions on this one point, for the reason, as we have already stated, that the evidence then before the court did not reveal that the state had a strong case against Mrs. O'Grady; but, with the facts as now stated by the applicant herein, can it be said that it was not his duty to en-

courage, rather than discourage, the proof of facts tending to show his client irresponsible on September 30, 1907? Certainly no question of personal interest under his contract for fees, or under the transfers of property that had been made to him, should have stood between him and his duty to his client.

Giving due weight to the unprofessional conduct of applicant in his relations to his client, Mrs. O'Grady, we would feel that his exclusion from practice during the past year was ample, both as a lesson to himself and as a warning to others, if it were not for the fact that the applicant does not even yet seem to appreciate that he has done anything conflicting with his duty as an attorney. He repeatedly states to the court in his petition filed herein that he "believes that he had done nothing wrong or improper," "he is conscious of no wrongdoing," "feels in his heart that he has done no wrong." From all this we must conclude that, if again admitted to practice, should he be retained under circumstances similar to those in case of State v. O'Grady, he would still feel that it would be no breach of the duty he owed his client to do toward such client those things for which this court criticised him in the disbarment proceeding.

We come, now, to the consideration of the conduct of the applicant since the disbarment proceedings. It appears that on January 1st last he commenced to publish at the city of Sioux Falls, in this state, a weekly paper. This paper claims to have had from the first a circulation of several thousand copies in this and adjoining states, and it was claimed in at least one issue that its circulation was greater in Minnehaha county than that of one of the leading daily papers of said county. Upon the hearing of his application there was offered and received in evidence a complete file of the issues of said paper up to the date of such hearing. Before calling attention to some of the articles contained in such paper, and in order to make apparent the materiality of many of the statements therein contained, we deem it important to state certain facts which either appear of record in this court or are of such a nature that this court takes judicial notice thereof.

One Emma Kaufmann was in June, 1906, arrested and

charged with the murder of her servant girl, Agnes Polreis. The nature of the offense and the circumstances surrounding the same, including the fact that the accused was the wife of a wealthy man and the girl a young girl of foreign birth and humble parentage, made the charge of much more than ordinary public interest. Intense feeling arose against the accused in her home county, bordering at times on threats of mob violence. Hon. Joseph W. Jones was then, as now, the judge of the circuit court of Minnehaha county, the county where the offense was charged to have been committed. Judge Jones, on filing of affidavit of prejudice, called in Hon. E. C. Smith, now member of this bench, but then a circuit judge of this state, to preside at the trial of Mrs. Kaufmann. Judge Smith granted a change of venue to the county of Moody. Mr. Egan, then a practicing attorney residing in Iowa, was employed by private parties as special prosecutor to assist the state's attorney in the trial of said case, and upon the trial Mr. Egan took practically full control thereof. The trial, from its very nature and the circumstances surrounding the case, was one attracting great public interest. Proceedings on such trial were published quite fully in the various papers circulating throughout this state, and the public pulse was raised to fever heat. Interest in said case and the result thereof was especially great in Sioux Falls and at and around the former home of Miss Polreis. The verdict of the jury was that defendant was guilty of manslaughter in the first degree. A new trial was sought, and denied by Judge Smith. Appeal was taken to this court, which court then consisted of three members, Justice Dick Haney, then presiding judge, Justice Corson, and Justice Fuller. Such appeal was finally submitted to this court on July 28, 1908. Before such submission Justice Fuller was stricken with what proved to be a fatal illness, and he died a few days prior to November 18, 1908, the date when the court by its presiding judge, handed down its opinion, reported in State v. Kaufmann, 22 S. D. 433, 118 N. W. 337. This court granted Mrs. Kaufmann a new trial, which trial was had in June, 1909; Judge Rice, of the Deadwood circuit, presiding, the state being represented in part by the same counsel

as formerly, but Thomas H. Null, of the Huron bar, being employed in the place of Mr. Egan, who at that time was disbarred from practice. This trial resulted in a verdict of simple battery, a fine of $100 was paid, and defendant discharged from custody.

Five years ago there arose a factional contest within the ranks of the majority political party of this state; one branch of said party recognizing as its leader Hon. A. B. Kittredge, of Sioux Falls, then a United States Senator, and the recognized leader of the other branch being Hon. Coe I. Crawford, now United States Senator from this state. In the convention of such party, in the summer of 1906, the faction led by Mr. Kittredge met defeat. Mr. Crawford was nominated for the office of Governor, and the remainder of the ticket was selected from his political friends. In the summer of 1908, after a very close contest at the primaries, Mr. Crawford was named his party's choice for United States Senator, defeating Mr. Kittredge, who was seeking re-election. Mr. Kittredge has for years been a leading member of the Minnehaha county bar, and as such was chosen as one of a committee of three to take active charge of the protest which was filed against Mr. Egan's first petition for admission to practice in this state, and the same committee at this time opposes his application for readmission. Soon after Mr. Egan established his residence in this state, he aligned himself with those who opposed Mr. Kittredge's candidacy for re-election to the United States Senate, and he took an active part in the campaign of 1908. He was himself a candidate before the primary for his party's nomination to the office of state's attorney of Minnehaha county, and, against the opposition of Mr. Kittredge and his friends, received such nomination. Prior to the election, the decision in the disbarment proceeding was handed down; but Mr. Egan's name remained on the ballot, and he was elected by an overwhelming majority. His right to qualify for the office was contested, and this court, then consisting of three members, Justices Haney, Corson, and Whiting, decided against Mr. Egan. The opinion, written by the author of this opinion, is found in Danforth v. Egan, 23 S. D. 43, 119 N. W. 1021.

Immediately after the transfer of her property by Mrs. O'Grady to Mr. Egan, an action was brought in the county court of Minnehaha county to have a guardian appointed for Mrs. O'Grady. This was strenuously resisted by Mrs. O'Grady, Mr. Egan acting as her attorney; but the county court, Judge Bailey presiding, appointed a guardian. Appeal was taken to the circuit court, and Hon. Joseph W. Jones affirmed the county court. On or about November 15, 1907, such guardian brought an action to compel Mr. Egan to reconvey the property received from Mrs. O'Grady. Judge Jones called in Hon. Frank B. Smith from the Mitchell circuit to preside at the trial of such cause. Judge Smith found for the guardian, and ordered a reconveyance. In justice to Mr. Egan we wish to state that he has reconveyed all of said property, except the cash and government bond. He had sold the bond, and has since accounted in the proper court for the proceeds of such bond and the cash.

It is claimed by Mr. Egan, as we understand from the articles in his paper, that a conspiracy was entered into between Mr. Kaufmann, Mr. Kittredge, and others by which it was sought to get Mr. Egan disbarred to prevent his having further charge of the prosecution of Mrs. Kaufmann. Mr. Egan stated that Mr. Kittredge claimed to be able to control this court, and stated that, as a part of such conspiracy and in furtherance thereof, this court was induced to grant to Mrs. Kaufmann the new trial, to disbar Mr. Egan, and to hold that he could not qualify as state's attorney. Mr. Egan claimed that, owing to his political prestige, Mr. Kittredge had undue influence with this court. We think it important that the political situation in this state, as hereinbefore given, be kept in mind in the reading and consideration of the matters hereinafter contained in determining the reasonableness of applicant's charges.

It will be borne in mind that this is not a proceeding brought to disbar Mr. Egan, but that he is an applicant before this court seeking admission to the bar of this state; and while we do not wish to be understood as holding that, in all cases, an applicant should be entitled to the same presumptions and to like consideration as a party already admitted, yet inasmuch as the appli-

cant is still a member of the bar of a sister state, we have considered it proper to treat the evidence submitted to us as though it was submitted in a disbarment proceeding, and, unless the same would justify disbarment, we feel that we should grant the application herein.

We do not undertake to copy all the articles appearing in the applicant's paper referring to the courts or the judges thereof; and, while some articles are copied in full, we have taken from others short clippings, being those parts that we consider material to the matter before us. Owing to certain legal propositions which we desire to consider, we have deemed it best to classify, in so far as possible, the articles published in the papers, and for the purpose of such classification will divide and subdivide them as follows: (1) Those relating to matter fully closed in court, or else having no direct reference to any particular action, and including: (a) Those referring to some member of this court. (b) Those referring to the court as a whole. (2) Those relating to matters still pending in this or lower courts, and including: (a) Those referring to the Kaufmann Case. (b) Those referring to the action brought to determine the right of applicant to qualify as state's attorney after his disbarment. (c) Those referring to this pending application.

It will be noticed that these articles embrace, not only editorials written by the applicant, but also clippings from articles taken by him from other papers and from letters. It cannot be questioned but that there is no difference in the responsibility of this applicant, as between the one class of articles and the other. Under the first heading will be found some clippings referring to matters then pending; but we have so placed them because it seems to us that they were directed particularly at this court or some member thereof.

Items Referring to Some Member of This Court.

"Elsewhere in this issue is a letter to the editor from that fearless, upright, young Norwegian, Peter Erickson, whom Frank Aikens sent for and tried to influence in the interest of Mrs. Kaufman. It is a wonder that Dick Haney did not do something about this lest it 'contaminate the Minnehaha bar.'"

"We afterwards practiced law constantly for six and a half years, up to the time of our disbarment by Mose Kaufmann, A. B. Kittredge and Dick Haney."

"Even Joe W. Jones would not stand for such a barefaced steal, and refused to sustain the old 'weeper's' demurrer to the complaint. So the 'weeper's' took it up to Dick Haney and Dick Haney sustained the demurrer which he had filed and Curtis still clings to the twelve hundred and fifty dollars or that portion of it that is not squandered."

"WHY not name Kittredge as a commissioner and let him decide the cases? It would be a good deal cheaper to the state as long as Dick Haney and Corson are on the bench, we doubt very much if there will be any dissatisfaction with Kit's findings."

"It will make a material change in the Supreme Court, and if Governor Vessey exercises good judgment in the selection of the new judges provided for, as he no doubt will, the court will no longer consist of Dick Haney, assisted by Corson."

"The Argus-Leader says that there are ten or twelve ex-convicts in Sioux Falls. Yes, and some of these are members of the Minnehaha bar in good standing with Dick Haney."

"It is with the hope of calling the attention of the good citizens of the state to the heinousness of the crime that was committed by Mrs. Kaufman, the conviction for which was treated as a joke by Dick Haney, that we now present the illustration in this week's American Republic."

"But of course it does not make any difference what crimes a man does as long as he is subservient to, and a member of the bunch, so for his ability to destroy records and cover up the dealings of the boss, he is given a position by Dick Haney and Corson as clerk of the Supreme Court."

"Our entertainment has been royal, supplied by a few thieves and dudle bugs of the Minnehaha Bar, supplemented by the eloquence of the 'Argus-Leader's woman orator' and the pique and spleen of 'Baby Dick.'".

"While the bar association has been given a certificate of character by Dick Haney, than whom no more learned jurist ever permitted another attorney to write a decision for him."

"As an argument in favor of increasing the membership of the state Supreme Court it is claimed that the court as at present constituted is away behind with its work. Perhaps when Kit gets out of the Senate he will help his friend, Dick, out some more in turning out ready-made decisions 'while you wait.'"

While the above are taken from editorials, the following is from a clipping from another paper:

"When a judge of the highest court in the state will tear from his body the robes of justice, and clothed in naught but verbosity, pomposity, and animosity, use in a legal decision arguments which a ten-year-old school boy would be ashamed to use in a district school debate."

Items Referring to This Court as a Whole.

We copy the following editorials:

"On August 17th, A. B. Kittredge took charge of an action to disbar us and publicly stated that 'He knew what the Supreme Court would do, that he would act on the committee and present the case to them.' On the 10th day of October an order was entered canceling our license to practice law, just as Kittredge said it would be, and we were assailed from the bench in a manner without parallel or precedent in the history of jurisprudence."

"All things have now been prepared and the way is open for the ultimate release of Mrs. Kaufmann and she will ultimately be turned loose."

"The remarkable quick action of the courts in the Egan cases shows that they can hustle out decisions when they are given to understand that it is necessary or in the interest of a political gang, and we do not see why they should not be compelled by law to render decisions in all cases brought before them within a reasonable time."

"Today A. B. Kittredge could not be elected alderman from any ward in Sioux Falls. As the cartoon shows and as everybody knows in this county, the cause of our disbarment is Kittredge; the reason, political revenge, jealousy and Mose Kaufmann's money."

We would also submit the following clippings from other sources found in applicant's papers:

"After hearing him no one can help but believe that there is something radically wrong with our courts and that a great injustice has been done him by disbarring him from practice."

"From an unbiased view it appears that the late decisions of the Supreme Court are more for political reasons than for justice, and nothing is being left undone to belittle Mr. Egan."

"Mrs. Emma Kaufmann the villianous, atrocious, cowardly, inhuman, dastardly murderess of Agnes Polreis, her servant girl, who was convicted of manslaughter first degree, about eighteen months ago, and who by the way has never served an hour in prison, has been granted a new trial by the so-called Supreme Court."

"The Supreme Court last week handed down the decision that Geo. W. Egan, the disbarred attorney, cannot qualify for the office of state's attorney of Minnehaha county, to which he was elected last fall by such overwhelming majority. Mr. Egan got what he expected in this court and he was not at all disappointed."

"And yet, with the Supreme Court packed with their tools, it was not difficult for his enemies to knock him out. The highest court of the state had no difficulty in getting to Mr. Egan's case immediately, but the Kaufmann murder case has been hanging fire for something like three years and seems to be as far away now as when, after having been convicted of murder, the defendant was granted a new trial. Is it any wonder that people of South Dakota, with scarce an exception, are demanding a revision of the courts?"

"He displeased Kittredge & Co., by convicting this woman and was disbarred from practicing law in the state."

"I know the bunch that you are up against and I understand the cause of your disbarment. It is all a dirty deal with the Kaufmann-Kittredge influence ruling things."

"The case was appealed to the Supreme Court, where, it seems, political influence has much more weight than law or evidence, and a new trial was granted."

"I am willing and I believe the great mass of South Dakota people are willing to take the opinion of Minnehaha county rather than that of a political Supreme Court. The people of South

Dakota are now up against the proposition that money and political influence are all-powerful, and that if a man or woman has money and political influence enough, they can commit murder with impunity and go scot-free."

"Thus there is one law in South Dakota for the rich and another for the poor. Go wipe out the flaming lie over your judicial benches: 'ALL MEN ARE EQUAL BEFORE THE LAW,' and put in its place 'IF YOU HAVE MONEY AND POLITICAL INFLUENCE YOU MAY COMMIT MURDER WITH IMPUNITY.'"

"It looks as though these outrages at the hands of the Supreme Court were for the express purpose of preventing Egan from prosecuting Mrs. Kaufmann. I think this is the first instance in history where the highest tribunal in a state has committed the unspeakable outrage of disbarring an honest and faithful attorney for the express purpose of SAVING A MURDERESS FROM THE JUST PENALTY OF HER CRIME."

"A millionaire in politics cuts a great figure and when you concentrate a barrel of gold and the supreme effort of a multitude of corrupt politicians on the little trifle of turning backward the wheels of justice, why what is a simple working girl, anyhow, that the mere matter of her life or death or the sacrifice of the honor and business careers of a few of the greatest men of a state and * * * what are such trifles that they should stand in the way of a Jew brewer with a barrel of boodle, or the wishes of the hungry mongrels who bark at his every beck for a mere smell at the bone."

"What use have we for penitentiaries? What use have we for long and complexed codes of law? What need of hiding our present rottenness behind a veil of pretended justice? Why not admit that some of our courts are as unholy as those with which the darkest ages of Europe ever blotted the pages of history."

"Meanwhile the attorney who secured her conviction at the first trial is disbarred from practice to satiate the vengeance of Mose Kaufmann and a ring of politicians who have fattened at the public crib in reward for attention to his interest."

"Realizing that it was impossible to break his hold on the

common people, his enemies, by a trumped-up charge, secured his disbarment as an attorney, by a prejudiced court."

"That greater and unspeakable crime consists in the corruption of our whole judicial machinery from the Supreme Court down to the lowest court official at Sioux Falls. In order to protect the wife of a rich Republican politican, the Supreme Court of this state has made itself a hiss and a byword in the mouths of the whole people of the state. It prostituted its august functions to disbar the only man who stood between this murderess and the penitentiary. In order to compass this judicial farce, charges were trumped up against George W. Egan, a man who is as much above his accusers as Jesus Christ was above Pontius Pilate. Outraged by this injustice the people of Minnehaha county elected the disbarred attorney to the office of public prosecutor by practically a unanimous vote, but the Supreme Court again interfered and forbade him to exercise the functions of the office to which he had been chosen by the people of his county, and this for the express purpose of protecting the wife of Kaufmann from the just penalty of her crime. The members of the Supreme Court and the corrupt Republican gang knew that if Egan was not disbarred Mrs. Kaufmann would go to the penitentiary. So this judicial infamy of disbarment was concocted and consummated."

And, not content with the power of his pen, the applicant even resorted to cartoons to heap further insult upon Justices Haney and Corson, and evidently designed to provoke the mirth of the thoughtless.

The charges contained in the foregoing articles from applicant's paper bring into question the integrity and official uprightness, the character and honor, of two of the members of this bench, and the same become, therefore, necessarily involved in the proceeding before us. And who are these men, against whom the applicant has thus poured forth the venom of his wrath; whom he seeks to bring under the contempt and scorn of the people of this and other states; who, if guilty of the crimes charged against them, should be driven by an outraged people from the high position to which these people have raised them,

should be driven from the sight of all decent men to die outcasts from society; who, the applicant would have us believe, had, at the beck and call of the political boss, sold their honor and good name, those things valued by good men high above all other worldly treasures, and which all hope to be able to bequeath unstained and untarnished to their children?

Justice Haney, the present presiding judge of this court, came to the present state of South Dakota when it was still a territory and entered upon the practice of his profession. Upon the creation of this state he was chosen by the voters of his circuit, judge of the circuit court, and served as such continuously until February 1, 1896, having been nominated for re-election in 1893 without opposition within his party. On February 1, 1896, he was appointed to fill a vacancy on the bench of this court; it being recognized by all people that he was the proper and logical appointee. It is well to note, in passing that up to this time, Hon. A. B. Kittredge, whom the applicant would have us believe has so improperly influenced the judges of this bench, was practically unknown to the politics of this state. Justice Haney has served as a member of this court for over 13 years, having twice been re-elected and having received his nomination without opposition from the members of his political party. It is well to note, also, that at his last election he led his party vote on Governor by over 1,000. Certainly he must have stood well with the opposing party, as well as among all factions in his own. He has been the author of many important decisions, involving, many of them, the rights of the masses as against the so-called classes, and his standing as a learned and upright jurist has never heretofore been called into question.

Justice Corson also came here in territorial days, and, upon the formation of this state, he was chosen by the people to the high position which he now occupies. Three times has he been re-elected to such office, having rounded out therein 20 years of continual service to the people of this state. He is a man whom to know is to love and admire, a gentleman of the old school, kindly and courteous in the extreme, yet, when need be, as firm as a wall. But a few weeks since, at a session of this court, the

bar of this state, to show the love and respect in which they held this dean of our bench, united in presenting him with a beautiful and costly token thereof. It was well said in one of the presentation speeches that the United States has her Marshall, Massachusetts her Shaw, New York her Kent, Michigan her Cooley, and South Dakota her Corson. To show the honor and respect in which he is held, not only by the members of his chosen profession, but by all the people of the state, it is only necessary to refer to the unusual honor conferred upon him by the Last Legislature of this state, when, regardless of faction or party, the members of such Legislature united in the passage of a law creating a new county and naming it after this man, splendid as a citizen and jurist. Yet it is this man, who, when he has reached nearly four score years, during 19 of which he has served his state faithfully and truly in the position of greatest honor within the gift of her people; it is this man, who in nature by inexorable decree must within a few years at most call to his great reward; it is this man and his fair name whom the applicant is willing to heap with calumny and abuse, in order that, perchance, he may pose as a martyr before the people of this state.

The applicant, in his closing address to this court, a copy of which was filed herein November 5, 1909, states, among other things: "I emphatically deny that there is a word or sentence in my paper casting any reflection upon the courts of this or any other state." "Within the columns of my paper, you will find no censure for the courts of the land." "I know it is the duty of every man to both preach and practice respect for the courts and obedience to its orders and decrees." "It is true, your honors, that in the columns of my paper I have attacked certain individuals as individuals, but have said nothing disparagingly of any court. I realize now that this attack was indiscreet and altogether wrong. But it occurred at a time when I knew and felt that I had been the victim of an outrage and terrible injustice." "But yet I feel that before this fair-minded court a mistake will not weigh against me when the error stands confessed." The above quotations need no comment from this court, when

they are read in connection with the foregoing and hereinafter contained clippings from applicant's paper, except, perhaps, to call attention that these attacks on the court and its members could not have been the spontaneous outburst of a wronged soul, resulting from loss of self-contral, thus causing the applicant momentarily to err, for the reason that the clippings aforesaid are grathere throughout eight months' publications of said paper.

It is well to note that applicant's attacks are not confined to this court or its members. Without entering into detail and quoting from the evidence submitted, we would state that within the pages of applicant's paper are to be found the gravest of charges and insinuations, reflecting upon the official integrity of three members of the circuit bench, Hon. Joseph W. Jones, Hon. Frank B. Smith and Hon. William G. Rice. It would seem that, immediately any party crossed applicant's path, he became the object and victim of his invectives. In regard to a splendid young attorney, a man who has practiced before us while we were on the circuit bench, and whom we learned to respect and admire as the very soul of honor, for an act that was at most but an error in judgment, and could not possibly be honestly distorted into any evidence of prejudice against the applicant, the applicant in his paper said: "We have seen this man Fairbanks hanging around Crawford's office in Huron, and have also seen him sneaking around with two or three of the bunch of. Sioux Falls crooks. We were then satisfied from his looks and actions that he would be easily reached if it was necessary for this bunch here to use him and the recent action at Deadwood shows us that our estimate of Fairbanks was not far from the truth."

Even the ministers of the gospel cannot escape the venom of his pen. It appears that one in his home city wrote a letter meeting his disapproval, and in each of two issues of his paper he devoted to this party more than a column of space. The following are fair samples of his utterances: "If he were honest, or had in his lying carcass one drop of the blood that flowed through the veins of the poor, lonely Christ, he would seek out his erring brothers, pray with them, and help them to their

feet." "In his heart burns the fire of envy, jealousy, and he is selfish, begrudging, and hypocritical."

One would be led to wonder if the applicant ever said a kindly or charitable word concerning his fellow man; but a reading of his paper will show that he is as strong in his praise of those whose conduct meets his approval as he is bitter in his denunciation of his imaginary enemies.

It would be well for applicant if he would take to himself, and profit by, many of the wise and truly beautiful things to be found within his paper and in his arguments before this court. In his closing address he says: "I hope that this court will consider all the facts and circumstances in connection with this case; that they will remember how easy it is to accuse, and how difficult it is to defend." The last sentence above applies peculiarly to charges made against a court. The Supreme Court of Alabama well said in Johnson v. State, 152 Ala. 93, 44 South. 671: "A judge cannot with propriety defend himself against attacks made by members of the bar, made through the press or by letters, because to do so would be not only to bring the judge in public contempt and disrepute, but would be to depart from all the wise traditions of the bench."

If the applicant knows of any evidence showing that any of our courts and judges are corrupt, he owes a debt to the people of this state to bring the judges before the bar of the Legislature for impeachment. On the other hand, until he can produce some evidence, he should presume them innocent, and not attempt to ruin the fair names they have won for themselves. We quote with approval the words of an opinion rendered in a case in many respects very similar to the one at bar, being that of In re Thatcher, supra: "If the judges who were attacked in these circulars were believed by the respondent to be guilty as he charges and insinuates, it was his privilege and duty to do what he could to have them impeached, so that they might be deposed from office, when found guilty. As an attorney, or a citizen, he had the right to criticise the judgments and conduct of the judges in a decent and respectful manner; but no man has a right at any time to degrade and intimidate a public officer, and bring his

office into contempt, by the publication of libelous matter imputing to him impeachable offenses."

The American Bar Association, in its Code of Ethics, which code has been adopted by the Bar Association of this state, has clearly stated the duty of a lawyer: "It is the duty of the lawyer to maintain towards the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged, and the person making them should be protected."

An eminent lawyer, in an address to the members of his profession, lately gave the following sage advice: "And, finally, gentlemen of the bar, do not forget the respect due to the majesty of the law and the dignity of the courts. In every enlightened government there must be an ultimate citadel of authority, to which all men may turn with calm confidence. In our government this citadel is the courts. Let not the vaporings of demagogues, the venom of disappointed litigants, or the sudden tides of political passion assail them or weaken their power; for it is a wise saying that 'where law ends tyranny begins,' and there is no tyranny like the tyranny of the mob. I do not deny the right or deprecate the use of reasonable criticism of the courts or the soundness of their decisions."

But it may be well asked: "Should this court, by any action it may take, attempt to curb in any manner the freedom of speech and liberty of the press? Is not the constitutional guaranty of the freedom of speech entitled to such consideration that all questions of mere libel or slander of courts, or charges of any kind against judges, howsoever opprobrious, had best be left to be determined in a proper action, civil or criminal, before a jury?" Upon this question the courts are greatly divided, many adhering to the common-law doctrine that criticism of the judicial officers,

even though made after the determination of the cause, may be
a proper cause .for disbarment or punishment for contempt.    State
v. Morril, 16 Ark. 384; Burdett's Case, 103 Va. 838, 48 S. E.
878, 68 L. R. A. 251, 106 Am. St. Rep. 916; In re Chadwick,
100 Mich. 588, 67 N. W. 1071; State v. Shepherd, 177 Mo. 205,
76 S. W. 79, 99 Am. St. Rep. 624; State v. McClaugherty, 33
W. Va. 250, 10 S. E. 407; People v. Green, 9 Colo. 506, 13 Pac.
514.    The great weight of authority, however, seems to be to
the contrary.    State v. Sweetland, 3 S. D. 503, 54 N. W. 415;
State Board, etc., v. Hart, 104 Minn. 88, 116 N. W. 214, 17 L.
R. A. (N. S.) 585; Dunham v. State, 6 Iowa 245; State v.
Tugwell, 19 Wash. 238, 52 Pac. 1062, 43 L. R. A. 717; State v.
Kaiser, 20 Or. 50, 23 Pac. 964, 8 L. R. A. 584; State v. Bee
Publishing Co., 60 Neb. 282, 83 N. W. 204, 50 L. R. A. 195, 83
Am. St. Rep. 531; State v. Circuit Court, 97 Wis. 1, 72 N. W.
193, 38 L. R. A. 554, 65 Am. St. Rep. 90; Ex parte Steinman,
95 Pa. 220, 40 Am. Rep. 638; In re Pryor, 18 Kan. 72, 26 Am.
Rep. 747.

The decision in Ex parte Steinman, supra, may well stand as
a leading case, not only on account of the ability of Chief Justice
Sharswood, who wrote the opinion, but particularly owing to the
fact that he was during his liftime, a recognized authority upon
all subjects relating to professional ethics.    He says concerning
lawyers:  "They  have  the  best  opportunities  of  observing  and
forming a correct judgment.  They are in constant attendance on
the courts.    Hundreds of those who are called on to vote never
enter a court-house, or, if they do, it is only at intervals as
jurors, witnesses, or parties.    To say that an attorney can only
act or speak on this subject under liability to be called to ac-
count, and to be deprived of his profession and livelihood by the
very judge or judges whom he may consider it his duty to
attack and expose, is a position too monstrous to be entertained
for a moment under our present system."    The charges against
the attorneys in that proceeding, and which charges were found to
be true, were that they had accused a certain judge of wrong-
fully deciding a case, influenced in such decision by motives of
political partisanship.    The court said:  "We have no hesitancy

in pronouncing such a publication to be a gross libel on its face. Nothing can be more disgraceful, not even, perhaps, that of direct bribery, than such an imputation on the motives of judges in the administration of justice."

The Supreme Court of Wisconsin, in the case of State v. Circuit Court, supra, says: "Important as it is that courts should perform their grave public duties, unimpeded and unprejudiced by illegitimate influences, there are other rights guaranteed to all citizens by our Constitution and form of government, either expressly or implied, which are fully as important, and which must be guarded with an equally jealous care. These rights are the right of free speech and of free publication of the citizen's sentiment on all subjects." In the case of In re Pryor, supra, the court said: "It will be born in mind that the remarks we have made apply only while the matters which give rise to the words or acts of the attorney are pending and undetermined. Other considerations apply after the matters have finally been determined, the orders signed, or the judgment entered. For no judge, and no court, high or low, is beyond the reach of public and individual criticism. After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere criticism or animadversion thereon, no matter how severe or unjust." And this court, in the Sweetland Case, supra, held: "The object of contempt proceedings is not to enable a judge who deems himself aggrieved to punish the supposed wrongdoer to gratify his own personal feelings, but to vindicate the dignity and independence of the court, and to protect himself, and those necessarily connected with it, while a matter is pending before it, from insolent and contemptuous abuse calculated to intimidate, influence, embarrass, or impede the court in the exercise of its judicial functions, or prevent a fair and impartial trial." In State v. Bee Publishing Company, supra, the court said: "Our decisions and all our official actions are public property, and the press and the people have the undoubted right to comment on them, and criticise and

censure them as they see fit. Judicial officers, like other public officers, must answer for their official actions before the chancery of public opinion."

We subscribe fully to the above holdings and the reasons given therefor, and quote with approval the following from the case of the State Board, etc., v. Hart, supra, as these words seem peculiarly applicable to the facts in this case: "In what we have said it is not our purpose to extenuate in the least the misbehavior of the accused. Few acts could be more disgraceful than the deliberate publication by an attorney, capable of correct reasoning, of such baseless insinuations. The case is of that sort which, considered of itself, might easily make bad law; but the question presented is vitally important to the entire bench and bar of this state, and even more so to its people, whose servants we are. It concerns not merely the power of the court to protect itself from undeserved censure, but involves in its determination that independence of the bar, upon the preservation of which civil liberty itself in large degree depends; and suspicion and distrust of the courts will not result from this ruling or its future application, as counsel for the prosecution predict. The people can be relied upon to discriminate, in the long run, between truth and falsehood; and the profession, from which our judges are chosen, taken as a whole, are always both eager and able to protect and defend the court when unjustly assailed."

But there can be such an abuse of the freedom of speech and liberty of the press as to show that a party is not possessed "of good moral character," as required for admission to the bar of this state under section 686 of our Political Code, and therefore to require that such person be excluded from the bar of this state; and to our mind the evidence submitted here shows such an instance. The applicant has been an attorney in the state of Iowa for some seven years, he is of more than ordinary intelligence and learning, and it would seem that we might adopt with slight changes the following words in the case of In re Thatcher, supra: "Nor can the respondent be justified on the ground of guaranteed liberty of speech. When a man enters upon a campaign of villification, he takes his fate into his own hands, and

must expect to be held to answer for the abuse of the privilege extended to him by the Constitution. An attorney of more than 20 years' standing at the bar must be presumed to know the difference between respectful, fair, and candid criticism, and scandalous abuse, of the courts which gave him the high privilege, not as a matter of right, to be a priest at the altar of justice."

We come, now, to the second class of improper articles found within the files of applicant's paper, namely, those relating to matters still pending in this and the lower courts. A matter is to be deemed pending until it reaches a final determination in the appellate court. State Board, etc., v. Hart, supra; In re Chadwick, supra; State v. Shepard, supra.

### Articles Referring to State v. Kaufmann.

From applicant's editorials we clip the following:

"And Mrs. Kaufmann can never be acquitted as her friends know, if we have charge of the prosecution. And that is why we were disbarred and why Mrs. Kaufmann was given a new trial. To fight this case and stand for justice has cost us this year ten thousand dollars and our license to practice law. Yet will we insist that justice be done."

"It is now fully admitted by everybody that Mr. Egan knew what he was talking about when before the June primaries he told what kind of an opinion would be written ordering a new trial for Mrs. Kaufmann and stated that this woman would be turned loose. The will of the people, it seems, is nothing compared with the power of influence and money."

"Dick Haney, in his very remarkable tirade and equally remarkable opinion, reversing the Kaufmann Case, practically ordered the defendant turned loose and boldly stated that 'there was testimony which, if believed by the jury, would show the defendant guilty of culpable negligence.' It is our purpose to put some of these scenes before the people by cartoon that they may judge, if they can do so by any mental process, how Dick Haney could call them 'culpable negligence.'"

"While we agree that the defendant will be turned loose because we know the rottenness and corruption that is in this case, yet we also know that it will take more than Argus-Leader

to get the people who know the facts to believe that it is a case of anything but murder protected by money and influence."

"It would perhaps be just as well if the case would never be tried again, because everything is 'fixed' and we are sure as it is possible to be sure of anything, that the defendant will never do a day for this most cruel and atrocious murder."

We would particularly call attention to the following, which applicant states was taken from a speech delivered by him in June, 1908, which would be after the appeal of the Kaufmann Case to this court, and before the decision of same:

"* * * The whole plot and plan is so transparent that not the most humble will be deceived. Mrs. Kaufmann will be turned loose and a new trial will be granted by the Supreme Court. Dick Haney will write the opinion. He will go as far as possible in ordering her release. He will lay all the blame on the special prosecutor and accuse him of manifold errors and grossest ignorance. This of course will help to discredit the man who must be destroyed. * * * But, ladies and gentlemen, I have felt the power and know the influence of the forces that are behind the defense in this case, and I say to you today that Mrs. Kaufmann, though every man who knows anything of the testimony, knows her guilty, will never do a day for her awful crime. I do not know what the future has in store for me, but I expect the worst and I shall fight to the end as best I can."

Articles Referring to Action Brought to Determine the Right of Applicant to Qualify as State's Attorney After His Disbarment.

After the applicant had presented the disbarment case to this court, and before the decision therein, he writes as follows in his paper:

"This we have done and with calmness and complacency await Dick's opinion which we firmly believe to have been rendered long ago."

"The most farcical proceeding that we have ever been a party to in our life, we witnessed at Pierre on Wednesday last, when we went to speak to Dick Haney, sitting as Chief Justice of the Supreme Court of the state of South Dakota, on our right

to hold the office of state's attorney. There is not a lawyer of any standing in the state, but knows that we are entitled to have the office under the election and the Constitution, but Dick Haney was so bitter and unreasonable, that he could hardly wait for the time to come to make his decision. His sympathy with the bunch that was fighting the editor of this paper was so apparent that it was really amusing. We behaved with our best dignity, and presented the matter under the law and Constitution and decisions of the state as best we could, but from the look on Dick Haney's face it was easy for all present to tell about what he would do." 

Articles Referring to the Pending Application.

The following are from applicant's editorials:

"We were tried and disbarred all within thirty days. We filed a petition for reinstatement about June 1st and are to be given a hearing September 1st—ninety days later."

"We realize that everything it is possible to do to prevent our readmission will be done, money will not be spared, and influence will be brought to bear wherever the same can be of assistance. An example of this was given to us in the action of two certain parties here in Sioux Falls. On Saturday, August 7th, Frank Aikens (Foxy Grandpa) was talking to a party in which he used the following language: 'I know that Egan will not be readmitted. We are sure of that. I know where I can drive a few pegs against him and I am going to do it." On Monday, August the 9th, Frank Aikens went to Pierre, and returned on Thursday, August 12th. Whether he was 'driving pegs' he was talking about or what he was doing, we do not know, nor de we care."

"We shall not believe that the Supreme Court as a body will allow this little bunch of thieves to dictate to or run it, no matter how much they may boast about their prowess. It is true that Kittredge has boasted that he 'would be responsible for the action of the Supreme Court,' and that he would see that things were accomplished if given an opportunity, but Kittredge is today a repudiated politician, a man who could not carry a ward in the city in which he lives, for any office in the gift of the people,

but who claims to base his remaining influence upon what he claims to be the fact of obligation of certain people in high places to him."

"We would like to practice law, we were educated for that profession, we have had some degree of success in it. We have been honored by the respect and confidence of every court, state or federal, before whom we have ever practiced, but not until we went up against the bunch at Sioux Falls, were we ever associated with individual men who claim to have the power and exercise it of controlling courts and judges. We are loath to believe that this can be done."

"We firmly expect at the hands of the great Supreme Court of this state to have our license returned to us that we may pursue the even tenor of our way. We will refuse to believe anything else, no matter what Kitrredge or Aikens, or old Keith or Kirby, may say or do to the contrary."

The following from other sources are copied into his paper:

"Ten members of the Minnehaha county bar have decided to fight Egan's being readmitted to the bar. Of course this was to be expected, but we believe as the Supreme Court is now constituted Mr. Egan will be readmtted."

"If the Supreme Court reinstates Geo. W. Egan, the disbarred attorney, it will, as it appears to us, have to virtually admit that it was at least in a measure mistaken and had done Mr. Egan a gross injustice. On the other hand if the court does not reinstate him after a careful examination of evidence producible, the general public, which feels that he has been hunted and persecuted ever since he came to the state, is going to rally to his support in a manner that will astonish the politicians of the state, and already some of them are becoming extremely anxious. Eighty per cent. of the people are with him and he is going to win out in his fight, no matter how the court may rule in this particular petition. The petty politicians and heelers are between the devil and the deep sea."

The case of In re Philbrock, 105 Cal. 471, 38 Pac. 511, 884, 45 Am. St. Rep. 59, was very much like the one at bar, in that the defendant therein had charged political corruption against

one of the Supreme Judges. This charge related to acts of his just prior to his election to the bench, such acts relating to a matter in which he was then an attorney, and which matter, at the time of these charges, was pending in the Supreme Court. After making certain insinuations, which were really veiled threats at the court as a whole, the attorney said: "But if this secret transaction of September 6, 1890, is not declared illegal and void upon the rules and principles declared in Egerton v Earl Bronlow, then all to whom knowledge of the case shall · come will no longer merely suspect or even think that the court may be corrupted. They will know it, they may point to the decision here as full proof of it. * * *" The court, referring to the above, said: "This is a palpable attempt to influence a decision of this court by base appeals to the supposed timidity of its justices, and made, too, by an officer of the court. It is intolerable. It cannot be suffered by any occupant of the bench who has a just sense of his duty to the people, to preserve the due dignity of their courts and the free course of justice. An attempt to influence a judge through fear of physical injury is no graver offense than such an attempt against his reputation. A high-spirited man might have perfect physical courage, and yet might, possibly, despite all his efforts against it, be, to some extent, insensibly affected by dread of the loss of his reputation and good name. Neither attempt can be for a moment countenanced without a manifest injury to the cause of justice. When people come into courts as litigants, they have the right to expect the best judgments of their judges, uninfluenced except by legitimate arguments made openly before them by counsel. They must expect those errors which will sometimes inevitably be committed by minds which are not infallible; but they should be able to feel sure that the impartiality of the court will not be disturbed by any influence of fear or favor. And clearly nothing tends more to disturb that impartiality than a menace that the decision of a cause a certain way will destroy or greatly injure the good name of the judge who shall make it. And when the punishment of such an offense is clearly within the jurisdiction of the court, as in the case of one of its own officers, it must impose the penalty or neglect its imperative duty."

In re Collins, 147 Cal. 8, 81 Pac. 220, the court said: "The alleged official misconduct of respondent—and there is no room for a misconception of the charge—consists of having disseminated through certain public journals false and malicious charges affecting the integrity of the judge in his official capacity, with intent to influence his action or discredit his proceedings in a matter then pending before him, and in which respondent was interested. This is charged as something aside from and independent of the transmission of formal charges against the judge to the Governor. and is alleged to have been done before they were transmitted. Preferring charges against a judicial officer in good faith and through the proper channel is a matter of legal right. Publishing false charges, to influence or affect judicial action in a pending cause, is misconduct on the part of an attorney doing so. This latter is what the respondent is charged with having done, and is a very different matter from preferring charges against a judge in a legal manner, and through the recognized channel, as a basis for action by the proper public officer or duly constituted tribunal."

In the case of In re Robinson, 48 Wash. 153, 92 Pac. 929, 15 L. R. A. (N. S.) 525, it appears that the defendant, in a petition for rehearing in a certain case pending in said court. had made statements regarding certain rumors which he claimed were circulating commonly, and which, if true, would reflect most seriously against the court. The defendant, in such petition, had intimated that a decision in his favor was the only method left to the court to clear its fair name. The court, referring to the above, said: "This language is susceptible only of the construction that, notwithstanding the respondent's disavowal of his personal belief in the alleged rumors, he has made them a part of the records of this court, with the evident intention of intimidating its members into rendering a decision in his favor. He substantially contends that such action is the only avenue of escape for this court from further scandalous rumors which would surely follow an adverse decision. * * * Our position is one of extreme delicacy. False and scandalous charges are said to have been made against the members of this court; and the respondent has improperly incorporated them in his petition."

In the case of State v. Bee Publishing Company, supra, an editor was charged with contempt of court, owing to certain articles published in his paper. The court said in relation thereto: "But they were manifestly intended to overawe and intimidate us. They appear to have been put forth for the purpose of preventing a decision in favor of the state. They were, under the circumstances, palpable acts of journalistic lawlessness, calculated to weaken the independence of the court and destroy confidence in its judgment. To justify them is to deny the supremacy of the law and assert the doctrine of newspaper absolutism. To admit that publishers may promote their interests in pending litigation by resorting to methods not available to others is to strike down our much vaunted principle of 'equality before the law,' and to declare that journalists, who choose to become malefactors, are a privileged class, and entitled as such to go unwhipped of justice. But the law recognizes no such distinction. It never has recognized such distinction. It accords to publishers no rights but such as are common to all. They have just the same rights as the rest of the community have, and no more. King v. Root, 4 Wend. (N. Y.) 113, 21 Am. Dec. 102. A distinguished judge has said. 'A man who speaks in a newspaper has no greater right than he who speaks out of it. A newspaper is no sanctuary behind which a person can shield himself for breaking the laws of the land.' "

In People v. Stapleton, 18 Colo. 568, 33 Pac. 167, 23 L. R. A. 787, it appears that the defendant had published several articles charging the Supreme Court with unwarranted delay in determining a criminal case pending on appeal, and the defendant, in such articles, had insinuated that there was politics connected with such delay. The court said: "Judges are human; they are possessed of human feelings; and when accusations are publicly made, as by a newspaper article, charging them, directly or indirectly, with dishonorable conduct in a cause pending before them and about to be determined, it is idle to say that they need not be embarrassed in the consideration and determination of such cause. They will inevitably suffer more or less embarrassment in the discharge of their duties, according to the nature of the charges, and the source from which such charges emanate.

When a judge tries and determines a cause, in connection with which public charges against his judicial integrity have been published, the public, as well as parties interested, are frequently led by the publication of the charges to distrust the honesty and impartiality of the decision, and thus confidence in the administration of justice is impaired. It is not only important that the trial of causes shall be impartial, and the decisions of the courts shall be just; but it is important that causes shall be tried, and judgments rendered, without bias, prejudice, or improper instruction of any kind. It is not merely a private wrong against the rights of litigants and against the judges. It is a public wrong, a crime against the state, to undertake, by libel or slander, to impair confidence in the administration of justice. That a party does not succeed in such undertaking lessens his offense only in degree."   ·

The applicant, in his opening address to this court, referred to his practice in the state of Iowa, which he says was "begun with personal felicitations of such men as Martin J. Wade, Horace E. Deemer, and Emlin McClain," and he calls our attention to the fact that ,after six years' practice in that state, he was able to present to us the indorsement of these men. We would commend to the applicant the consideration of the following words from the court presided over by Justice Horace E. Deemer, as such words are found in Field v. Thornell, 106 Iowa 7, 75 N. W. 685, 68 Am. St. Rep. 281 : "It must be added, however, that the courts have no power or desire to control the press in its legitimate sphere. Its freedom is jealously guarded by the law, and made secure in the Constitution. It enjoys the utmost latitude in reviewing the action of the courts, and may, after the particular litigation is ended, assail, with just criticism, opinions, rulings, and judgments with the weapons of reason, ridicule, or sarcasm. 'But the liberty of the press must not be confounded with mere license. Liberty of the press stops where a further exercise would invade the rights of others. This provision of the Constitution does not authorize a usurpation of the functions of the courts. Under the plea of the liberty of the press, a newspaper has no right to assail litigants during the progress of a trial, intimidate witnesses, dictate verdicts or judgments, or spread before juries its opinion of the merits of cases which are on trial.' In re Shortridge, 99 Cal. 526, 34 Pac. 227, 21

L. R. A. 755, 37 Am. St. Rep. 78. It is seldom, however, that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary, or seek to control or improperly influence its conclusions. Courts are constantly passing on questions affecting the life and liberty of the citizen, as well as the rights of property; and the freedom of the judiciary to investigate and decide is quite as important to the well-being of society as the freedom of the press. Let the courts perform their duties unmolested; but their final judgments, as well as the manner of reaching them, are thereafter open to the world for such criticism or condemnation as taste or necessity may require."

We would that the laws of this state, like those of Minnesota, had authorized us to appoint a special Supreme Court to pass upon this application. It certainly places any court in a most delicate and unenviable position when, in a proceeding of this nature, it must pass upon charges made against its own purity, and against the integrity of its members; but the duty, howsoever unpleasant it may be, must in a proper case be performed or else courts must be left subject to the unbridled insults, slander, and threats of evil-minded persons. Happily, in the pending case, but two members of this court have been the objects of abuse from the pen of the applicant herein, and the task at our hand is the lighter therefor. It needs no argument from us to show that the publications cited herein are in direct line with the facts passed on in many of the cases which we have cited; but we have yet to find a case where the misconduct was so flagrant, extending as it does over such a long period of time, and relating to several different matters then pending in court, and being inspired by such apparent malice. These publications not only charge corruption in this court, but much that is contained therein must, from its very nature, not only have had a tendency to embarrass the two members of the court thus charged with corruption, in the duties performed by them since some of these charges were made; but it must necessarily tend to embarrass the whole court in the discharge of its duties in relation to the pending application. Can it be said that it would tend to leave the minds of the people in a fair, unprejudiced condition in relation to the charge against Mrs. Kaufmann, then

pending for retrial, to have the attorney who had had charge of her prosecution doing all in his power, through the columns of his newspaper, to lead such people to believe that her husband and his friends, through the power of money and corrupt political influence, had prostituted the highest court of this state, and induced it to give to this woman a second trial, to disbar the attorney who had procured her conviction, and to deny him the right to hold the office of public prosecutor of the county where the venue of the crime charged was laid, and attempting to lead the people to believe that this was all done for the unholy purpose that justice might be thwarted, and a murderess go unpunished of her crime? Would this tend to create an atmosphere in which a defendant, in a case then pending, could have that fair and impartial trial guaranteed every person, high or low, and which is one of the glories of our land? And when the second verdict should be returned, whether it be in fact just or unjust, would the minds of a people that had breathed such befouled atmosphere be able to give to such verdict a fair consideration? Could any court escape embarrassment in the decision of a matter pending against the applicant, to have such an article go forth in the press of the state, as his article relating to his argument before this court in the case wherein his right to hold office of state's attorney was questioned? It must necessarily cause the one toward whom the charges therein contained were directed to be in such position where, instead of being moved by the even-handed spirit of justice, he must be in danger of erring in his decision therein, either against this applicant from feelings of pique, or in favor of this applicant from fear that he might do him an unconscious wrong. Judges are human, and therefore subject to the weaknesses common to all.

Let us consider the articles published relating directly to this pending application. The public are told that, to prevent this court granting this application, "money will not be spared, and influence will be brought to bear whereever the same can be of assistance." There is only one place for this money and influence to be used. This application is to this court. Therefore it is the members of this court who were to be corrupted, if

possible, by money and wrong influence. Judge Aikens comes to Pierre, as the records of this court show, to argue another cause before this court; but applicant would have the public believe that it was to "drive a few pegs against him." Where must these "pegs" be driven? Necessarily into the hearts and minds of the members of this bench. The public is told that "the bunch at Sioux Falls _* * * claim to have the power, and exercise it, of controlling courts and judges." What court, if any, is to be controlled by this "bunch," except it be this court? The necessary deduction is that a decision adverse to applicant will be proof that the "power" has been "exercised." And again, one of the articles he copies claims that "the petty politicians and heelers are between the devil and the deep sea." It would seem that the writer of this article and the applicant, by copying same, were doing their utmost to put this court in the same unenviable predicament in which they have established the politicians. If we admit Egan, we admit that we have heretofore done him "a gross injustice." If we refuse his application, no matter how justly, we shall stir the populace to "rally to his support in a manner that will astonish the politicians of the state." In a word, the only way open to us to remove any suspicion that we have been corrupted by money or political influence, and the only way in which we can prevent the applicant becoming a power politically in this state, is to admit applicant to the bar of this court.

Causes in courts must be tried upon evidence, and not assertion. It is easy to prefer charges, and resort to insinuations and innuendoes, and this seems to be applicant's chosen method. Judge Jones affirmed the order appointing a guardian for Mrs. O'Grady. He took a trip to Europe. Therefore applicant, in one of his cartoons, insinuates that Kaufmann's money paid the expenses of the trip. Mr. Kittredge takes a trip to Deadwood, the home of Judge Rice. Soon after the papers publish a purported interview, in which Judge Rice is reported to have reviewed the evidence in the Kaufmann Case, and made statements to the effect that Mrs. Kaufmann was not guilty of the particular crime charged against her. Applicant insinuates there

may, be some connection between Mr. Kittredge's trip and such reputed words from Judge Rice. Applicant does not call the attention of his readers to the fact that Mr. Kittredge was in attendance upon the sessions of the State Bar Association, that he and Judge Rice were opposed in the factional fight within their party, and that Mr. Kittredge was not then in a position to wield political influences.

We refer to the late factional contest in this state only because the applicant has himself tried to make that one of the grounds for the charge of political corruption in connection with the matters referred to in the record herein. Kittredge and Kaufmann are friends; Kittredge and Justice Haney and Corson are politically friendly; this court reverses the Kaufmann Case and disbars the applicant; therefore money and politics have freed Mrs. Kaufmann, and to do it, have attempted to destroy applicant. No better basis for any of his charges is to be found in the record herein.

One can read the record in this and the disbarment proceedings in vain to find a scintilla of evidence that any court or judge has been wrongfully influenced in any of the matters referred to therein. The only evidence that any person has ever attempted, by bribery, corruption, or fear, to influence any court or judge, are the copies of applican't papers, where by veiled threats, and threats from which all cover has been torn, he has sought to influence the decision of this court. Great as is this wrong, not only to this court and its members, but to the public, the applicant has committed a far greater wrong to society and government in trying to undermine the confidence of the public in the courts of our land. He would have it believed that they are rotten to the core. We brand this charge as infamously false, and any one giving it a moment's consideration can but admit its falsity. Judges seldom reach our circuit or supreme benches, except after being in the public eye for years, and the public are seldom deceived in the mental and moral characteristics of those whom they select for high position after years of acquaintance. The people, whatever faults they may be willing to overlook, demand absolute integrity in those they place in judicial

positions, and it is seldom they err in choosing men of that quality. There have been, and always will be, corrupt and unworthy persons in every one of life's callings; but they are the exception, and we are proud to be able to say that they are the rare exception on the benches of our land. The writer has been upon the bench but a few years. During that time, until in this proceeding, no person has ever attempted, directly or indirectly, by word, action, gift, or reward of any kind, to improperly influence our action in any matter coming before us. We have talked with many who have grown gray in service as judges, and they one and all tell the same story. The people have such confidence in our courts that even the evil-disposed seldom see fit to try and tamper with them. And it is well; for, if ever the time comes when the people of our land, as a body, in truth and fact lose confidence in the court, then comes anarchy, with all its terrible results. On the other hand, confidence in other branches of our system of government may at times be shaken to the very foundation; but, with confidence left in the courts, law prevails, and government, with all its blessings, endures.

It is perfectly clear to our minds that these publications were malicious, and not prompted by any proper motive. They are not the mere result of disappointment, occasioned by adverse decisions, but are prompted by the writer's apparent desire to pose as a champion of the wronged and oppressed, and as a victim of Mammon and political corruption. The following words from the opinion In re Philbrook, supra, seem very applicable to the facts in this case: "As respondent has, in the same connection, assailed not only all the members of this court and the two superior judges above referred to, but also certain reputable lawyers who were at one time associated with him in the litigation, and a special administrator who was appointed at his own instance and out of his own office, charity might possibly suggest that he is the victim of abnormal suspicion and distrust. But no such defense is made; and, moreover, his brief and argument show a bright intellect and a clear mind. His conduct, therefore, exhibits only a sheer intent to be maliciously contemptuous."

The applicant has had much to say, both in his paper and

also in his arguments before this court, in regard to the wrong motives and professional delinquencies of some of the attorneys whom he claims have been active in pushing the disbarment proceedings and resisting the pending application. Some of these charges are of the most serious nature, and, if true, should bring merited punishment; yet applicant well knows that such charges have no proper place before this court in this proceeding. If these parties are guilty, as claimed by applicant, he should take the necessary steps to have them brought to the bar of justice and to have their licenses to practice canceled. It is a sad commentary on our profession that its ranks include some unworthy to perform the high trusts coming to its members. Yet, when one thinks of the temptations and pitfalls lying in the path of the attorney, we often wonder that more have not fallen. It is also a sad commentary that the members of the profession are so negligent in taking steps to purify the bar. But the experience of the older members has taught them that, when they act as individuals in such matters, their motives are misconstrued, no matter how pure and lofty they may be. It is well that we have our State Bar Association, and we would suggest the propriety, wherever possible, when bringing disbarment proceedings or taking steps to oppose admission to the bar, of taking action through the proper committee of such association. We assure the applicant, and all those who may believe that there are members of our bar whose conduct unfits them to remain within our profession, that this court will, at all times, stand ready to consider charges against any member whomsoever, and, whenever such charges are established by competent evidence, we shall not hesitate to take such action, either by reprimand, fine, suspension, or expulsion, as the facts may warrant.

It is the order of the court that the application herein be, and the same is, denied.

McCOY, J. I fully concur in every word of the opinion of my associate, Justice WHITING. Stripping this case of all bald assertion wholly unsupported by evidence, stripping it of all the venomous poison that has crept in on both sides, we still have

standing out in bold relief something like the following: Mr. Egan entered into a contract with his client, of an hour's acquaintance, whereby he was to receive $10,000 for defending her against the charge of murder, and, whether she was sane or insane, it had the effect of relieving her of all her earthly possessions, and would have left her a penniless pauper, a fit subject for the poorhouse, had she lived and been cleared of the charge upon trial. When this proceeding was being heard before this court, he openly and boldly asserted that Mrs. O'Grady, his client, was guilty of murder. This was in direct violation of his duty to his client. He had entered into a contract to receive $10,000 to defend her liberty and honor against the charge of murder. Upon being defeated in his litigation growing out of his relations with Mrs. O'Grady, he then entered upon a systematic course of vilification of the courts and all who did not agree with him, and, while we recognize to the fullest extent the rights of litigants and the public in general to criticise the decisions of the courts, yet we are of the opinion that the privilege of free speech may be abused; that there is a vast difference btween honest free speech, honest criticism, and infamous vilification.

While this court, under a proceeding of this character, has no authority to find Mr. Egan guilty of criminal libel, as a jury might on an indictment, yet we are at liberty to take into consideration his moral unfitness, appearing from his groundless accusations. While he has been loud in his assertions as to the courts of this state being guided by outside influence, not one syllable of evidence has he offered in proof of such assertions. On the other hand, the evidence in this case conclusively shows that he himself has written and published article after article tending to influence and to interfere with judicial action in matters then pending before the courts and in which he was interested. Finally, in his last argument before this court, he says, in substance: "I have not written or spoken a word against the integrity of the courts of this state." The only legitimate inference is that his memory is sadly deficient or his conception of the truth very limited.

SMITH, J. A careful consideration of the entire record before us in this proceeding leads me, unavoidably, to the conclusion that the views expressed by Judges WHITING and McCOY are absolutely sound, both in law and in fact; and, disagreeable as such a duty necessarily is, I am constrained to concur therein.

HANEY, P. J., and CORSON, J., taking no part in the decision.